**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **RHONDA N. BAIRD,** *pro se*, <br><br> **Plaintiff,** <br><br> v. <br><br> **DAVID HOLWAY, et al.,** <br><br> **Defendants.** |

**Civil Action No. 06-1985 (JDB)**

## MEMORANDUM OPINION

Plaintiff Rhonda N. Baird brings this action against various officers of Local R3-77 ("Local") and the National Association of Government Employees ("NAGE"). According to plaintiff, both the Local and NAGE (the national union to which the Local was affiliated during the relevant time period) have retaliated against her for exercising her protected right to speak out against union policies. Thus, she filed suit pursuant to the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401, 501, and also added various state law tort claims seeking monetary and injunctive relief. NAGE and its President, David Holway, have moved to dismiss the Amended Complaint as it pertains to them.[1] That motion is now fully briefed and ripe for resolution. Upon careful consideration, and for the reasons set forth below, the Court will grant the motion.

---

[1] Defendant Dwayne Jeffers answered the complaint *pro se* but is not a party to this motion. Richard Petta, another named defendant, has not responded to the complaint to date. For purposes of this Memorandum Opinion, the Court will use the term "defendants" to refer to the moving defendants: NAGE and David Holway.

## BACKGROUND

It bears noting at the outset that the *pro se* complaint in this case is "not a model of clarity," as defendants put it.  Defs.' Mot at 1.  That would be understandable for a typical *pro se* litigant, but it is a bit odd here because plaintiff is actually a practicing attorney at the Pension Benefit Guaranty Corporation ("PBGC").  Be that as it may, the Amended Complaint concerns many of the same events and issues that were the subject of an extensive and thoughtful opinion by Judge Huvelle in Johnson v. Holway, 439 F. Supp. 2d 180 (D.D.C. 2006).  Following a bench trial in that case, Judge Huvelle made thorough findings of fact and law that the Court will draw upon here where appropriate.

Plaintiff has been employed as an attorney with PBGC since 1997.  Am. Compl. ¶ 9.  She is currently assigned to the Office of Chief Counsel and is a member of the Local.  Id.  Local R3-77 "is entrusted with the responsibility to represent the 500 bargaining unit employees of PBGC in Washington D.C. with respect to certain of their terms and conditions of employment."  Id. ¶ 2.  In 1999, the Local decided to associate itself with a national union.  It ultimately settled upon NAGE, "a 45,000-member labor union that represented municipal, state and federal employees." Johnson, 439 F. Supp. 2d. at 185.  NAGE is itself a local of the Service Employees International Union ("SEIU").  Am. Compl. ¶ 4.  From 1999 until May 2007, there is no dispute that NAGE served as the Local's "exclusive representative."  Id.

During the course of its association with NAGE, the Local became embroiled in several highly contentious Equal Employment Opportunity ("EEO") disputes with PBGC.  Many of those disputes proceeded to arbitration between the Local and PBGC.  NAGE maintains an arbitration policy governing actions initiated by its local unions.  Pursuant to that policy, locals

must submit "the case to the NAGE Legal Staff for review."  Defs.' Mot. Ex. A ¶ 2.[2]  If NAGE's

legal staff determines that the case is meritorious, the Local "receive[s] legal and financial

support [from NAGE], the national paying half of the union's bill."  Johnson, 439 F. Supp. 2d at

193.  If, however, a case is determined to "lack merit," the local receives no such support from

NAGE.  Defs.' Mot. Ex. A ¶ 6.  The policy also outlines a procedure for appeal and review of the

legal staff's determination on the merits of a case.

The operative events in this case began to unfold in April 2002.  During that month,

plaintiff testified as a witness in a "contentious arbitration brought by the Local challenging the

structure and operation of PBGC's Equal Employment Opportunity Program."  Am. Compl. ¶ 10.

Plaintiff was initially hesitant to participate in the proceeding because she feared retaliation by

PBGC but she ultimately testified because "the Local needed bargaining unit employees to step

up."  Id.  Following her testimony on behalf of the Local, plaintiff "felt a decided chill from

PBGC labor management officials -- Deputy General Counsel Philip Hertz in particular."  Id. ¶

11.  Then, in November 2002, plaintiff was "accosted in her office by her acting supervisor, John

Paliga."  Id. ¶ 12.  Paliga physically intimidated plaintiff by backing her into a corner, making her

"extremely fearful for her safety."  Id.  She promptly reported the incident to PBGC management

---

[2] "In determining whether a complaint states a claim, the court may consider the facts
alleged in the complaint, documents attached thereto or incorporated therein, and matters of
which it may take judicial notice."  Howard v. Gutierrez, 474 F. Supp. 2d 41, 47-48 (D.D.C.
2007) (citing Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006)).  "[I]t is a well-
settled principle that the decision of another court or agency, including the decision of an
administrative law judge, is a proper subject of judicial notice."  Opoka v. INS, 94 F.3d 392, 394
(7th Cir. 1996).  Accordingly, as defendants point out, the Court may consider NAGE's
arbitration policy "as Plaintiff has referred to it in her Complaint."  Defs.' Mot. at 3 n.3.
Similarly, plaintiff's FLRA complaint, discussed below, may also be considered here as it too
was referenced in plaintiff's Complaint.  Finally, the Court may take judicial notice of Judge
Huvelle's opinion in Johnson; indeed, both parties referred to that decision in their filings.

but was met only with "sneers and smirks"; she insists that management "intentionally failed to conduct an objective investigation." Id.

Plaintiff informed "PBGC and the Local of the emotional and psychological struggles she faced because of the incident and subsequent events especially the difficulties she faced working in an environment in which she no longer felt either safe or secure." Id. ¶ 14. She "subsequently filed a[n] [EEO] grievance in a desperate attempt to alleviate the stress she felt." Id. The Local consequently invoked arbitration "to redress the violations committed by supervisor John Paliga and various management officials." Id. ¶ 15. Pursuant to NAGE's arbitration policy, the Local submitted the case to NAGE for review, but "the national subsequently determined that the arbitration lacked merit and therefore denied funding." Johnson, 439 F. Supp. 2d at 207; Am. Compl. ¶ 16. Plaintiff "doggedly" pursued NAGE's internal appeals process to no avail. Id.

Frustrated by NAGE's rejection, plaintiff nevertheless proceeded with her arbitration "at her own costs."[3] Id. Around the same time that NAGE issued its rejection of plaintiff's arbitration claim in early 2003, tensions between the Local and NAGE were reaching a boiling point. As detailed in Johnson, certain Local officials were becoming increasingly agitated by NAGE's treatment of on-going arbitrations. See 439 F. Supp. 2d at 197-203. The Local's then-President, Valda Johnson, filed an unfair labor practice complaint with the Federal Labor Relations Authority ("FLRA") against NAGE, see id. at 199, triggering a series of meetings

---

[3] As explained in Johnson, plaintiff initially secured her own attorney to represent her at the arbitration. 439 F. Supp. 2d at 207. Local officials, however, wanted to "preserve [their] involvement in the case," and plaintiff subsequently decided "to use local representatives during her arbitration, modifying the retainer agreement with her attorney accordingly." Id. Unfortunately, "the local's handling of the case became unexpectedly contentious," id., which ultimately led in part to this lawsuit.

between NAGE and Local officials.  During those meetings, plaintiff was "outspoken about her opinion that NAGE was not providing the Local with the assistance it needed, especially on EEO cases, and that NAGE was also responsible for the breakdown in the relationship between its organization and certain Local officials."  Am. Compl. ¶ 17.  According to plaintiff, "NAGE President Holway was especially hostile to [plaintiff] after the meeting."  Id.

NAGE eventually launched an investigation into the Local's finances after President Johnson had "refused to provide documents to the National as part of an investigation in connection with allegations that repeated requests for an account of the Local's treasury had been ignored."  Johnson, 439 F. Supp. 2d at 209.  As a result of that investigation and numerous complaints that NAGE received concerning the Local's leadership, "Holway imposed an emergency trusteeship on Local R3-77, appointing Stephanie Zaiser as trustee."  Id. at 213. Pursuant to NAGE's constitution, the national held a hearing with Local members regarding the imposition of the emergency trusteeship.  Id. at 215.  During that hearing, plaintiff again spoke out against NAGE's conduct.  Id.  The ousted Local leadership then promptly "initiated a legal action . . . challenging the imposition of the trusteeship and resulting actions of NAGE."  Am. Compl. ¶ 20.  The Johnson opinion is the result of that action.

According to plaintiff, she "filed several declarations in [Johnson] expressing her belief that NAGE unlawfully retaliated and discriminated against certain employees including her by failing and refusing to advance arbitration matters involving EEO claims."  Id.  Significantly, she also "filed several unfair labor practice charges ("ULP") with the Federal Labor Relations Authority . . . to try to obtain some relief from NAGE's refusal to provide any support for her arbitration matter and other harmful actions taken by NAGE and the Local."  Id.  Plaintiff was

especially dismayed that "the NAGE Trustee . . . decided to withdraw the Local from assisting with the Baird Arbitration." Id.

Eventually, plaintiff was "able to obtain some assistance with representation at the Local level." Id. ¶ 21. The only in-house steward available to assist her, however, was Dwayne Jeffers, who had "no relevant experience representing arbitration matters and no legal education," according to plaintiff. Id. The relationship between plaintiff and Jeffers rapidly deteriorated and became increasingly acrimonious. As plaintiff would have it, Jeffers "did not care about any resulting 'collateral damage' from his conduct, . . . [such as] adverse impact on other employees." Id. ¶ 23. Plaintiff, on the other hand, was "strongly opposed" to that practice. Id.

Tensions ran high between plaintiff and Jeffers. Beginning in early 2005, plaintiff asserts that "Jeffers began calling [her] names such as a 'pathological liar' and 'psychotic'" in email correspondence to PBGC management. Id. ¶ 25. Additionally, Jeffers accused plaintiff of making "terrorist style" threats and referred to her as a "pornographer's friend." Id. Plaintiff responded by filing complaints concerning Jeffers's conduct with the Local, NAGE, and PBGC. She also requested that Jeffers be removed from any involvement in her arbitration proceedings. Id. At that point, however, Jeffers had become an officer of the Local and plaintiff's protests evidently fell on deaf ears. Indeed, plaintiff contends that "President Holway, NAGE, and the Local leadership all failed to take any action in response to complaints about Mr. Jeffers [sic] completely unprofessional conduct." Id.

Meanwhile, plaintiff's arbitration proceeded on a bifurcated basis. The first phase was the liability inquiry. During that portion of the arbitration, plaintiff asserts that PBGC attempted to portray her psychiatric condition in a disingenuous light. Id. ¶ 22. Plaintiff had evidently sought

-6-

counseling in the aftermath of the discriminatory behavior directed towards her. That counseling, she contends, "resulted in a misdiagnosis." Id. She asserts that "PBGC [was] aware that the early medical treatment . . . resulted in a misdiagnosis," but it nevertheless attempted to utilize that error to its advantage in the liability proceedings. Id. Despite PBGC's best efforts, however, the arbitrator issued a decision finding PBGC liable for unlawful retaliation in April 2005. Id. ¶ 26. Specifically, the "arbitrator determined that [plaintiff] was retaliated against primarily because of her testimony on behalf of the Local and NAGE." Id.

        With the damages phase of the arbitration underway, plaintiff and Jeffers attended a conference with the arbitrator on November 21, 2005. Id. ¶ 27. During that meeting, Jeffers disclosed that he had "provided large amounts of the record in the arbitration to Mr. Perry . . . in response to a subpoena." Id. Those disclosed documents included plaintiff's medical records used during the liability phase of the arbitration. This became a large source of anxiety for plaintiff because she believed that those records were subject to a protective order, not to mention inaccurate and potentially damaging to her career. Plaintiff immediately notified union officials of this development by filing complaints with President Holway, NAGE, the Local, and PBGC. Id. ¶ 28. No remedial action was taken in response. "During the next several months, [plaintiff] beseeched Holway, NAGE and the Local to take action to retrieve and redress the dissemination of the highly private information contained in medical and personnel records." Id. Those efforts were also unsuccessful.

        Exasperated, plaintiff filed the instant action. She believes that NAGE and the Local refused to assist her in retrieving her medical records in retaliation for her outspoken criticism of both entities. Plaintiff subsequently declared her candidacy for President of the Local "to try to

return . . . some semblance of a representative organization" to the union.  Id. ¶ 29.  On April 2,

2007, she won the election and assumed presidency of the Local.  Shortly thereafter, on May 14,

2007, plaintiff "received a letter from NAGE President Holway informing her . . . that NAGE

had decided to rescind its status as the exclusive representative of the Local."  Id. ¶ 32.  NAGE

cited the "expense of 'ongoing litigation'" as the motivating factor behind its decision to sever ties

with the Local.  Id.  NAGE then filed a petition with the FLRA to effectuate the disassociation.

According to plaintiff, if NAGE successfully withdraws its representation, the collective

bargaining agreement ("CBA") currently in place with PBGC would be thrown into "jeopardy

and lost."  Id.  That, in turn, might necessitate that on-going arbitration disputes -- including the

damages phase of plaintiff's arbitration -- be moved to a different forum.  Id.

## STANDARD OF REVIEW

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson,

355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007)

(per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule

12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must

furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause

of action."  Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286

(1986).  Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted). Hence, although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is impossible, and 'that a recovery is very remote and unlikely,'" id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the "threshold requirement" of Fed. R. Civ. P. 8(a)(2) is "that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief,'" id. at 1966 (quoting Fed. R. Civ. P. 8(a)(2)).

        The notice pleading rules, however, are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at 1965)). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan, 478 U.S. at 286).

## DISCUSSION

        Plaintiff's Amended Complaint launches no fewer than eight counts against defendants.

Despite the litany of causes of action, however, plaintiff's claims can be effectively broken down into two categories: claims pursuant to the LMRDA and claims pursuant to state or common law. The Court will address each category in turn.

### I.    LMRDA Claims (Counts I & II)

In Count I of her Amended Complaint, plaintiff asserts that defendants have violated her rights under Title I of the LMRDA, which establishes a "Bill of rights" for members of labor organizations.  Am. Compl. ¶¶ 33-42; 29 U.S.C. § 411 ("Bill of Rights of Members of Labor Organizations").  In relevant part, Title I provides that union members may freely "express any views, arguments, or opinions."  29 U.S.C. § 411(a)(2).  "Labor organizations are barred from retaliating against those who exercise their right to speech provided by Section 411(a)(2)." Johnson, 439 F. Supp. 2d at 228 (citing Ritz v. O'Donnell, 566 F.2d 731, 736 (D.C. Cir. 1997) ("Section [529] clearly prohibits a union from penalizing its members because they have exercised their rights of free speech and assembly, and the courts have not hesitated to nullify disciplinary actions that have infringed upon those rights.")); see also 29 U.S.C. § 529.  That prohibition is enforced pursuant to 29 U.S.C. § 412, which authorizes a "civil action in a district court" for violations of rights protected by Title I.

"In order to prevail on a claim of retaliation under Title I, a plaintiff must demonstrate by a preponderance of the evidence that her protected speech was a cause for the challenged [adverse conduct]."  Johnson, 439 F. Supp. 2d at 228 (citing Lamb v. Miller, 660 F.2d 792, 794 (D.C. Cir. 1981)).  Moreover, "proximity between the protected conduct and the union's action" alone is not sufficient to state a cognizable claim under Title I.  Id. (citing Yager v. Carey, 910 F. Supp. 704, 725 (D.D.C. 1995)).  Instead, a plaintiff must demonstrate a "causal connection"

between the alleged retaliation and the exercise of protected speech rights. Id. at 229.

> Here, plaintiff alleges that:
>
> The actions and inactions of Holway and NAGE in response to well founded complaints filed by [plaintiff] were taken to punish her for her expression of her opinion about Holway and his actions towards members of the Local including her opinion expressed during the Trusteeship Action and ULP charges.

Am. Compl. ¶ 40. As the Court reads the Amended Complaint, there are three possible bases for plaintiff's Title I retaliation claim that relate specifically to action or inaction by NAGE and Holway: (1) the failure to aid plaintiff in her dispute with Jeffers over her medical records; (2) the failure to support plaintiff's arbitration in the first instance; and (3) the decision to withdraw NAGE's status as the Local's exclusive representative. Upon inspection, none of those allegations can provide an adequate basis to survive a motion to dismiss.

To begin with, defendants argue that plaintiff has "alleged no facts supporting a reasonable inference that NAGE or President Holway's inaction was attributable to retaliation, rather than an entirely permissible motivation." Defs.' Mot. at 9. They maintain that "neither NAGE nor President Holway had any obligation to respond to Baird's complaints, for her arbitration was solely a Local matter." Id. Defendants are correct. Plaintiff has indeed failed to demonstrate that there is a causal connection between any alleged retaliation and the exercise of her protected rights under Title I.

The primary shortcoming that infects plaintiff's allegations is straightforward: she has not shown that either NAGE or President Holway incurred any duty to respond to her complaints concerning Jeffers's conduct. In the absence of such an obligation, there is simply no basis to conclude that defendants' inaction was motivated by retaliatory animus. Indeed, the bulk of

-11-

plaintiff's argument on this point rests on conclusory assertions that "[t]he factual statements in

the Amended Complaint about NAGE and Holway's failure to act and hostility to the Plaintiff

when coupled with her outspoken statements against the Defendants has [sic] sufficient 'heft' to

move Plaintiff's Title I claims to discovery."  Pl.'s Opp'n at 9.  But although plaintiff has amply

pleaded facts that demonstrate that defendants did not respond to her requests for assistance, she

has not explained why that inaction states a cognizable claim under Title I.  As defendants

correctly point out, "the Complaint contains no allegations establishing either an obligation or a

practice for Defendants to intervene in any dispute between a local union member and the local's

officers."  Defs.' Reply at 3.

       Plaintiff's vague suggestion that NAGE's "willingness to impose a trusteeship on the

Local for violations that were not as egregious" as the actions taken against plaintiff, Am. Compl.

¶ 10, somehow demonstrates that NAGE had a duty to intervene in disputes between members of

the Local is not at all persuasive.  As defendants correctly observe, "[t]here is an obvious

difference" between the two circumstances cited by plaintiff.  NAGE imposed a trusteeship on

the Local as a result of serious financial mismanagement, in addition to widespread complaints

by Local members that leadership was "suppressing dissent within the union."  Defs.' Reply at 5.

Indeed, the Local's former leadership was also openly feuding with NAGE employees, thereby

impeding the national's investigation of the Local's affairs.  See Johnson, 439 F. Supp. 2d at 212-

13.  The full account of this truly dysfunctional local is set out in Johnson and need not be

repeated here.  For present purposes, it suffices to say that defendants are correct when they argue

that the mismanagement that resulted in the trusteeship "implicate[d] the rights of every member

of the bargaining unit and raise[d] questions regarding the local's continued ability to exist."

Defs.' Mot. at 5. Plaintiff's allegations here, by contrast, implicate only her rights. In fact, her complaints raised solely local matters; whether her medical records were improperly disclosed in response to a subpoena does not in any way relate to the relationship between the Local and NAGE. Tellingly, defendants persuasively argue that plaintiff "does not dispute that the Complaint lacks any allegation that NAGE has either a practice or policy of intervening in disputes between local union members." Defs.' Reply at 4. Hence, defendants' prior actions taken with respect to the Local did not impose on them a duty to intervene in plaintiff's dispute with Jeffers.

Next, plaintiff contends that the fact that defendants "knew [that] they maintained ultimate responsibility for the handling of the Plaintiff's Arbitration," Pl.'s Opp'n at 10, rendered them obligated to respond to her complaints concerning Jeffers. Because her quarrel with Jeffers stems from a disagreement over the handling of her arbitration, the argument goes, defendants must ultimately accept the responsibility to resolve any issues arising out of that arbitration. That position is untenable. To begin with, as explained above, NAGE expressly disclaimed any interest or responsibilities in plaintiff's arbitration pursuant to its established policy. Although plaintiff acknowledges this, she nevertheless insists that NAGE's admissions during the Johnson trial impose additional obligations on defendants here. Pl.'s Opp'n at 10. Specifically, NAGE officials conceded that authority over arbitrations is an important aspect of NAGE's role as the Local's certified bargaining agent. See Johnson, 439 F. Supp. 2d at 224.

But the Court fails to see how that concession advances plaintiff's argument here. As explained in Johnson, the plaintiffs there "offered no legal or factual authority in support of their contention that NAGE 'was legally obligated to provide financial and legal support to the Local,

without question, in any case the Local decided to take to arbitration.'" Id. (emphasis in original).

In fact, the court expressly indicated that NAGE had no such obligation:

> [P]laintiffs themselves acknowledged NAGE's ability to consider the merits of
> arbitrations before proceeding. . . . No other policy would be reasonable, as NAGE
> is the certified bargaining agent with the corresponding right to control the strategy
> of arbitrations, and regardless, a national's obligations cannot be totally subservient
> to the whims of a local.

Id.  The Court cannot find that NAGE's generalized authority over arbitration matters translates

into a duty to intervene in a dispute between two Local members arising out of an arbitration in

which NAGE had long-ago specifically disclaimed all interest and responsibility.  Plaintiff offers

no reason in law or logic to conclude otherwise.[4]  As defendants aptly put it, "neither NAGE nor

President Holway had any obligation to respond to Baird's complaints, for her arbitration was

solely a Local matter."  Defs.' Mot. at 9.

   To the extent that plaintiff argues that defendants' initial and continued refusal to provide

her with any legal or financial support for her arbitration constitutes actionable retaliation, that

arguments also fails.  Simply put, defendants declined to support plaintiff's arbitration well

before she first engaged in the protected activity at issue here.  See Defs.' Reply at 3.  Indeed,

plaintiff engaged in that activity -- criticizing NAGE's policy and practice towards Local EEO

cases -- precisely because she was dissatisfied with the national's decision not to support her

arbitration proceeding.  Consequently, then, it is evident that the requisite causal link is lacking

here.

---

[4] This conclusion is bolstered by the fact that plaintiff previously filed a duty of fair
representation claim against the Local, and not NAGE, when she was initially dissatisfied with
the representation in her arbitration.  See Defs.' Reply at 8.  This suggests that plaintiff was fully
aware that it was the Local, and not NAGE, that retained ultimate responsibility for her
arbitration.

Turning to NAGE's withdrawal petition, plaintiff argues that defendants' decision to sever ties with the Local -- and, specifically, "the manner in which it instituted and explained the decision" -- was "calculated to seriously damage Plaintiff's reputation and create hostility towards her in her workplace" and thus constitutes unlawful retaliation. Pl.'s Opp'n at 11. That may well be the case, but the Court lacks jurisdiction over this question. "On May 11, 2007, NAGE filed a petition with the FLRA, disclaiming interest in representing the bargaining unit at the PBGC." Defs.' Mot. at 6. Defendants have indicated that they filed that petition pursuant to 5 U.S.C. § 7111(b)(2), which permits a party to seek "clarification of, or an amendment to, a certification then in effect or a matter relating to representation." Defendants are correct that judicial review is only appropriate "*after* the FLRA's administrative process has been exhausted and a final order issued." Defs.' Mot. at 14-15. The FLRA has yet to issue a final order on the petition. Moreover, any judicial review of the FLRA's decision when and if it is issued would take place in the appropriate court of appeals -- rather than a district court -- pursuant to 5 U.S.C. § 7123(a). Thus, it is evident that this Court is not the appropriate forum for plaintiff to press this argument.

Plaintiff next argues that defendant Holway has conceded under oath that he has a fiduciary "duty to bargaining unit employees." Pl.'s Opp'n at 9. In her view, Holway breached that duty by failing to intervene on her behalf when she requested assistance in dealing with Jeffers. In addition to Holway's judicial admission, plaintiff cites 29 U.S.C. § 501(a) as another source of the fiduciary duty that she believes Holway owed to her. Neither argument is persuasive. To begin with, Holway's statement concerning his fiduciary obligations was made in the context of his testimony regarding his decision to impose a trusteeship on the Local. Johnson, 439 F. Supp. 2d at 214. As previously indicated, the trusteeship involved the continued

viability of the Local; indeed, Judge Huvelle expressly found that Holway had "'no choice' but to place Local R3-77 under a trusteeship and thereby return it to functional governance." Id. at 226. In short, Holway's testimony regarding his fiduciary duties in that context sheds no light on whether he had a similar obligation to become involved in plaintiff's dispute with another member of the Local.

To be sure, Section 501(a) indicates that "officers . . . of a labor organization occupy positions of trust in relation to such organization and its members as a group." Furthermore, that section also identifies several specific duties that an officer owes to the organization, such as holding its money and property solely for the benefit of the organization. But plaintiff has not demonstrated that Section 501(a) also imposes a fiduciary obligation on the president of a national labor organization to intervene in personnel disputes unique to one particular local. Indeed, NAGE is a national union consisting of over 45,000 members; it would be difficult to conceive that NAGE's president could perform that function in the first instance. In any event, defendants are correct to point out that "29 U.S.C. § 501(a) . . . does not equate to a duty to intervene in disputes among members of a local union arising out of an arbitration that NAGE has expressly disclaimed any responsibility for or involvement in handling." Defs.' Reply at 3-4. And plaintiff has identified no particular facts that would bring this case within the purview of Section 501(a).

Finally, in Count VIII, plaintiff asserts a *respondeat superior* claim against defendants. In particular, she argues that even if defendants are not primarily liable under the LMRDA, they are vicariously liable for any actions by the Local officials -- here, Jeffers and Petta -- that may have violated the LMRDA. To begin with, *respondeat superior* is a theory of liability, not a separate

-16-

cause of action that demands its own count.  Putting that aside, plaintiff's argument is without merit in any event.

The D.C. Circuit has explained that "it has long been established that a collective entity, including a labor organization, 'may only be held responsible for the authorized or ratified actions of its officers and agents.'"  Berger v. Iron Workers Reinforced Roadmen Local 201, 843 F.2d 1395, 1427 (D.C. Cir. 1988) (quoting Shimman v. Frank, 625 F.2d 80, 95 (6th Cir. 1980)).  That same concept holds true when "an international union is sued for the conduct of its affiliated local."  Id.  Indeed, "Congress 'adopted a common-law agency test' to govern the liability of an international for the acts of its affiliated locals" pursuant to the LMRDA.  Id. (quoting Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 217 (1979)); see also Phelan v. Local 305, United Ass'n of Journeymen, 973 F.2d 1050, 1062 (2d Cir. 1992) ("These principles apply . . . to union democracy claims under the LMRDA.").  Thus, "a plaintiff must adduce specific evidence that the international 'instigated, supported, ratified or encouraged' those actions . . . or 'that what was done was done by their agents in accordance with their fundamental agreement of association.'"  Berger, 843 F.2d at 1427 (quoting Carbon Fuel, 444 U.S. at 217) (emphasis added).  The common law agency test underscores Congress' recognition that "a local union *may* in practice enjoy a considerable degree of actual autonomy, despite its formal dependence upon the parent international for its continued existence."  Id. at 1428 (emphasis in original).

Against that backdrop, defendants' argument is straight-forward: "Plaintiff alleges no facts indicating that NAGE authorized, ratified or approved any alleged misconduct by Petta or Jeffers."  Defs.' Reply at 12.  Defendants maintain that plaintiff has simply failed to allege that any agency relationship exists between NAGE and the Local and that defendants could "be

-17-

responsible for the acts of Petta and Jeffers, both of whom are officers of the Local, only if agency principles applied." Id. at 15.  Plaintiff's only response to this argument is that "NAGE argues from law that addresses the responsibilities of international unions. . . . [But] NAGE is not an international union." Pl.'s Opp'n at 12-13.  Although that statement is true enough, it overlooks the obvious point that NAGE is the Local's parent union.  And defendants correctly argue that "[a]s the parent entity, NAGE stands in the same place vis-a-vis the Local as an International union would to its local affiliates." Defs.' Reply at 13.  Indeed, "NAGE and the Local are separate legal entities, with separate capacities, for example, to sue and be sued." Id. Simply put, Carbon Fuel and its progeny concern the relationship between a parent union and its local affiliates.  Whether the parent union is an international union or merely a national union is immaterial to the agency analysis.

Defendants are correct that plaintiff has not sufficiently alleged that NAGE or Holway authorized, ratified or otherwise approved any unlawful conduct on the part of the Local officials. Instead, plaintiff has merely asserted that defendants neglected to take action in response to plaintiff's repeated complaints.  But that alone is insufficient to constitute the "specific evidence" of agency required to impose vicarious liability upon NAGE.  See Berger, 843 F.2d at 1429 (explaining that "a union's failure to act in opposition to discriminatory practices of an organization with which it has no agency relationship" is insufficient grounds to render the parent union vicariously liable for the practices of the local); see also Phelan, 973 F.2d at 1061 ("An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts.") (emphasis added); Brenner v. Local 514, United Broth. of Carpenters, 927 F.2d 1283, 1289 (3d Cir. 1991) ("Although the

International may have been intentionally or negligently guilty of tunnel vision, we agree with the district court's holding that the evidence produced by the plaintiffs does not show that the International encouraged, authorized or ratified the actions of the Local in discriminatorily failing to refer plaintiffs to work.").

Plaintiff suggests that NAGE's status as the Local's exclusive representative is proof of the requisite agency relationship. Pl.'s Opp'n at 13. As the bargaining representative, NAGE is subject to claims for breach of the duty of fair representation brought by members of the Local. Defs.' Reply at 13-14.[5] But that does not imply or indicate that defendants ratified, approved or otherwise sanctioned the actions of the Local officials here. More importantly, plaintiff herself concedes that NAGE disclaimed any involvement or responsibility with respect to her arbitration. Thus, contrary to the sort of active management or participation contemplated by an agency relationship, NAGE expressly declined any role in the arbitration that gave rise to this dispute.

The trusteeship presents an interesting twist in this analysis. While the NAGE-appointed trustee was in control of the Local, NAGE was arguably exercising the sort of direct and actual control that might constitute a legal agency relationship. Whatever the merits of that contention, however, it is not at issue here. NAGE first declined to support plaintiff's arbitration well before the imposition of the trusteeship. Similarly, the primary events concerning the disclosure of plaintiff's medical records occurred <u>after</u> the Local had been returned to self-governance. Defendants point out that "NAGE's trusteeship over the Local was lifted on February 2, 2005."

---

[5] In any event, a claim for breach of the duty of fair representation must be brought before the FLRA. Plaintiff, in fact, brought such a claim against NAGE, which the FLRA ultimately rejected. <u>Id.</u> at 16 ("Indeed, Plaintiff presented this allegation to the FLRA, which considered whether the release of Plaintiff's medical information violated the duty of fair representation and, in a decision issued September 28, 2007, held that it did not.").

Defs.' Mot at 12-13.  From that point forward, "NAGE ceased to have 'actual control' over [plaintiff's] arbitration."  Id. at 13.  By plaintiff's own admission, her "first complaints about Jeffers' conduct were made in 'April and May 2005.'"  Id.; Am. Compl. ¶ 25.  Most importantly, plaintiff first learned of Jeffers' disclosure of her medical records on November 21, 2005 -- well after the termination of the trusteeship.  In short, the key events in this case did not transpire during the pendency of NAGE's trusteeship over the Local.  Thus, as defendants correctly put it, the "trusteeship allegations . . . do not advance [plaintiff's] attempt to hold NAGE responsible for the actions of the Local."  Id.

In sum, plaintiff has failed to demonstrate that she has alleged adequate factual and legal bases to hold defendants primarily liable for any violation of the LMRDA.  Similarly, her attempt to hold NAGE and Holway vicariously liable for the actions of Local officials fails because she has not alleged that NAGE stands in a common law agency relationship vis-a-vis the Local.  In the absence of that connection, it would thwart "Congress' clear statement of the limits of a[] [parent] union's legal responsibility for the acts of one of its local unions" to impose vicarious liability upon defendants here.  Carbon Fuel, 444 U.S. at 217-18.  Thus, the Court will grant defendants' motion to dismiss on the LMRDA counts.

## II.    State and Common Law Claims (Counts III - VIII)

In the remaining counts, plaintiff asserts a litany of state law claims against defendants, including invasion of privacy, defamation, intentional infliction of emotional distress, negligence, and a cause of action pursuant to the District of Columbia Mental Health Information Act.  It appears, however, that plaintiff has only asserted direct claims against these defendants in Count V (intentional infliction of emotional distress) and Count VI (negligence).  Counts III, IV,

and VIII only apply to defendants (if at all) vicariously under the theory of *respondeat superior*.

For the same reason identified above -- namely, the lack of an established agency relationship

between the Local and NAGE -- the Court will dismiss the vicarious liability counts.[6]  That

leaves Counts V and VI, which, as explained below, the Court will also dismiss because they are

preempted by federal labor law.

       Plaintiff argues that "Holway and NAGE calculatedly failed to act to protect the private

confidential information in the Local's possession despite months of requests from [plaintiff] that

the information be protected."  Am. Compl. ¶ 64.  That action, according to plaintiff, "resulted in

intentional infliction of emotional distress."  Id. ¶ 65.  Similarly, plaintiff states in conclusory

fashion that defendants "held positions of trust vis-a-vis the Plaintiff" and "breached the duty

owed to [her] by their actions," thus rendering them liable for negligence.  Id. ¶ 69.  Although

these bare allegations are not particularly enlightening, it is evident that the basis for these two

claims is precisely the same conduct discussed above in the context of the LMRDA.  Indeed, it is

also the very same conduct that formed the basis for plaintiff's duty of fair representation claim

filed before the FLRA in May 2006:

> This complaint seeks redress from the intentional failure of [NAGE] to fulfill the
> duties and obligations it owes me under its own Constitution and Bylaws, under
> federal labor and civil rights laws, and other applicable rules and laws.  This failure
> stems from NAGE's attempts to retaliate and discriminate against me for testifying
> and engaging in other protected activities that reflected negatively on NAGE.

Defs.' Mot. Ex. B.  Defendants are correct that plaintiff's primary allegation "in both the FLRA

charge and [in Counts V and VI] is that NAGE's failure to respond to her complaints about

Jeffers's conduct violated NAGE's duty of care to represent her fairly and discriminated against

---

[6] Moreover, those claims would arguably be preempted by federal labor law in any event.

her on the basis of her protected activity."  Defs.' Mot. at 18.

With that established, it is evident that the claims contained in Counts V and VI are pre-empted by federal labor law.  The Supreme Court has explained that the FLRA has exclusive jurisdiction over fair representation claims in the first instance.  See Karahalios v. Nat. Fed. of Federal Emp., Local 1263, 489 U.S. 527, 536 (1989) ("To be sure, courts play a role in . . . fair representation cases, but only sitting in review of the FLRA.") (emphasis added).  Accordingly, the D.C. Circuit has held that if a plaintiff's state law claim presents the same issues as a duty of fair representation claim, it is preempted by federal law.  May v. Shuttle, Inc., 129 F.3d 165, 179 (D.C. Cir. 1997) ("The Court . . . agrees . . . that plaintiffs' state law claim is the same as the federal claim.  Accordingly, the state law claim must be dismissed."); see also Buesgens v. Coates, 435 F. Supp. 2d 1, 4 (D.D.C. 2006) ("Plaintiff's claims amount to nothing more than an allegation that [the union] breached their duty of fair representation.  Therefore, plaintiff's complaint must be brought before the FLRA.").

So, too, plaintiff's state law claims here amount to "nothing more" than allegations that NAGE breached its duty of fair representation.  Pursuant to federal labor law, an exclusive representative has a duty to represent "the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership."  See 5 U.S.C. § 7114(a)(1).  Plaintiff's negligence and intentional infliction of emotional distress claims, such as they are, allege that NAGE and Holway discriminated and retaliated against her.  Thus, they fall squarely within the purview of a fair representation claim.  Plaintiff evidently agrees because, as indicated above, before instituting the present instant, she first filed an FLRA complaint with the very same allegations.  She does not seek review of the FLRA's decision here; nor could she,

-22-

because judicial review of such an order must take place in the appropriate court of appeals.  In any event, because the claims in Count V and VI are properly characterized as duty of fair representation claims, they fall within the exclusive jurisdiction of the FLRA.  Accordingly, the Court will dismiss those claims.[7]

In sum, plaintiff's state law claims either fall within the exclusive jurisdiction of the FLRA or otherwise fail because she has not asserted an adequate basis to hold NAGE and Holway vicariously liable for the actions of the Local officials.[8]  Consequently, the Court will grant defendants' motion to dismiss those claims.  Because the Court will also grant defendants' motion to dismiss the LMRDA claims, the Amended Complaint will be dismissed in its entirety with respect to defendants Holway and NAGE.

---

[7] Plaintiff's sole argument that her state law claims are not preempted is flawed for two reasons.  She argues that "state law provides independent rights for the state law based claims made against Defendants -- the D.C. Mental Health Information Act."  Pl.'s Opp'n at 12.  Indeed, she maintains that she "has rights that flow from this law that co-exist with her rights under the LMRDA.  Thus, [plaintiff's] state law claims have an independent basis and are not preempted."  Id.  To begin with, however, to the extent that plaintiff's D.C. Mental Health Information Act cause of action presents a cognizable claim at all, it does so solely against Jeffers.  That act "makes it unlawful for a mental health professional, facility, or its employees to disclose or permit the disclosure of mental health information without authorization, unless certain exceptions are met."  Defs.' Reply at 18; see also D.C. Code Ann. § 7-1201.01 et seq..  Plaintiff's sole allegation on this point is that Jeffers improperly disclosed her mental health records; she does not assert that either NAGE or Holway also did so.  Thus, liability could only flow to NAGE or Holway vicariously, but the Court has already precluded *respondeat superior* as a source of liability in this instance.  Second, defendants are correct that the "test for whether a state law claim is preempted by federal labor law is not, as Plaintiff suggests, whether the state law provides an independent cause of action."  Defs.' Reply at 15.  Instead, "a claim is preempted 'if it is based on the same conduct that would support a federal duty of fair representation claim or if it seeks to vindicate the same rights.'"  Id. (citing Cooper v. TWA Airlines, LLC, 349 F. Supp. 2d 495, 508 (E.D.N.Y. 2004)).  As explained above, plaintiff is in fact attempting to vindicate the same rights in this claim as she did in her fair representation proceeding.

[8] The Court expresses no opinion as to whether the underlying actions of the Local officials were in fact unlawful.

## **CONCLUSION**

For the foregoing reasons, the Court will grant defendants' motion to dismiss.  A separate

Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:  March 7, 2008