# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RHONDA N. BAIRD, Pro Se** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DAVID HOLWAY, et al.** ) | |
| ) | **Case No. 06-1985 (JDB)** |
| **Defendants.** ) | |
| ——————————————————————) | |

## PLAINTIFF'S MOTION FOR RECONSIDERATION
## OF THE COURT'S MARCH 7, 2008 MEMORANDUM OPINON[1]

Pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure ("FRCP"), Plaintiff

moves this Court to reconsider its March 7, 2008 Memorandum Opinion in this action.

Defendants David Holway and the National Association of Government Employees ("NAGE"),

(collectively, the "Defendants"), confused the Court about the relationship between NAGE and the

Plaintiff. As the Defendants know, NAGE, and not NAGE Local R3-77 (the "Local"), is the

exclusive representative of the Plaintiff and the other members of the bargaining unit at the Pension

Benefit Guaranty Corporation ("PBGC"). NAGE and its President, David Holway, have an

obligation to address complaints made by NAGE members. The premise of the Court's holding in

its Memorandum Opinion was adversely impacted by Defendants lack of candor with the Court.

Through this filing, Plaintiff requests that the Court take this opportunity to reconsider its decision

and reverse its dismissal of Plaintiff's First Amended Complaint ("Am. Comp."). Defendants'

attorneys were advised of Plaintiff's intent to file this motion.

---

[1] In its March 7 Memorandum Opinion, the Court took judicial notice of several documents. In addition to those documents, Plaintiff requests that the Court also take judicial notice of the documents attached to this motion including NAGE's Constitution and Bylaws, which was mentioned in Plaintiff's First Amended Complaint (Attached as Exhibit 1). Plaintiff also submits the Bylaws of NAGE's Local R3-77 (attached as Exhibit 2). Through these documents Plaintiff seeks to correct the misleading and confusing representations of Defendants.

## STATEMENT OF FACTS

### I.    Background Information

Plaintiff Rhonda Baird is an employee of PBGC, a government agency, and the current

President of the Local. Plaintiff's First Amended Complaint ("Am. Comp.") at ¶ 1. She began her

employment with PBGC in 1997. *Id.* In February 2003, the Local invoked arbitration to address

certain workplace concerns raised by the Plaintiff. Am. Comp. at ¶ 15.

### II.    NAGE is the Exclusive Representative of the Bargaining Unit at PBGC

NAGE is the exclusive representative of the bargaining unit at PBGC. Am. Comp. at ¶¶ 4,

72. The Local is a unit of NAGE and was organized to operate within the framework of NAGE's

Constitution and Bylaws. Am. Comp. at ¶ 2. The Local is entrusted with the responsibility to

represent the bargaining unit employees at PBGC. Am. Comp. at ¶ 4.

### III.    NAGE has Established Internal Union Procedures for Handling Allegations of Misconduct by its Members

NAGE's Constitution and Bylaws govern the conduct of the Local's officers. Am. Comp. at

¶ 72. Specifically, Article XII of NAGE's Constitution and Bylaws outlines the process for

disciplining Locals and members of NAGE. *See* NAGE's Constitution and Bylaws attached as

Exhibit 1, pgs. 28-34. Section 1 of NAGE's Constitution and Bylaws outlines the various charges

that can be brought against Local officers and members. *Id.* Section 2 explains the procedures for

handling charges brought by members of a Local and determined at the Local level. *Id.*

Section 3 outlines the mechanism for charges brought by or action taken by NAGE's

president. *Id.* For example, NAGE's president is authorized to act to ensure that NAGE's members

are not subjected to harm or the risk of harm from acts of members—the list of enumerated

violations include the wrongful taking or retaining of "papers or any other property" belonging to

NAGE or a NAGE local. *Id.* NAGE previously applied its disciplinary procedures against officers

and members of the Local.  *See Johnson et al. v. Holway*, et al., 439 F. Supp. 2d 180, 218-222

(D.D.C. 2006).  The Local operates within the framework of this Constitution and Bylaws.  Am.

Comp. at ¶ 2.

### IV.    NAGE was Aware of Misconduct Likely to Subject NAGE, the Local and its members to Harm

NAGE President Holway imposed a trusteeship on the Local in November 2003.  Am.

Comp. at ¶ 19.  During the trusteeship, NAGE took little or no action to understand and address

the issues that were inherent in the Local.  Am. Comp. at ¶ 24.  The Local remained insolvent

throughout the trusteeship.  *Id.*  When NAGE returned the Local to self-governance, a lot of the

internal rancor and strife that lead to the trusteeship continued.  *Id.*

In early 2005, NAGE was informed of the misconduct of various Local officials, including

Dwayne Jeffers, towards the Plaintiff.  *See* Am. Comp. at ¶ 25.  Plaintiff specifically requested

that NAGE and the Local act to protect private confidential information in Mr. Jeffers'

possession.  *Id.*  Over six months later, Plaintiff learned that Mr. Jeffers wrongfully released

most, if not all, of the private confidential information in his possession from Plaintiff's

arbitration record.  *See* Am. Comp. at ¶ 27.  Plaintiff reported the release of this information to

both NAGE and the Local.  *See* Section VI below.

Additionally, after the Local was returned to internal self-governance, NAGE and NAGE

officials remained very involved and were aware of problems within the Local.  Am. Comp. at ¶ 29.

Internal strife and conflicts among Local officials began and escalated with NAGE copied on

emails.  *Id.*

### V.    NAGE's Arbitration Policy Does Not Negate its Obligation to Take Corrective Action to Address the Conduct of its Members and Officers

As the Court in Johnson states, in December 2006, NAGE adopted an arbitration policy.

*Johnson*, 439 F. Supp. 2d at 193.  Under that policy, cases are submitted to NAGE for review; if determined to be meritorious a case receives legal and financial assistance from NAGE.  *Id.* Cases determined by NAGE to lack merit ultimately receive no assistance "for either the costs of the arbitration or legal representation."  *Id.*  NAGE's Arbitration Policy coexists with its Constitution and Bylaws and does not address or alter the procedures for handling complaints about the conduct of NAGE members and officers.

**VI.    Plaintiff Filed a Complaint With NAGE to Address the Misconduct of Certain Local Officers and not NAGE's Failure to Pay Fees or Represent her in her Arbitration**

Plaintiff learned of the dissemination of her medical records and the personnel records of other employees on November 21, 2005.  Am. Comp. at ¶ 27.  On the same day, Plaintiff reported the release to both Local and NAGE officials.  Am. Comp. at ¶ 28.  Plaintiff's report disclosed not just the release of her information, but also disclosed that *other* members' personnel information was released.  Am. Comp. at ¶ 27.  In addition to reporting the release of information, Plaintiff's email expressly stated that the Local and NAGE received "several expressions of concern about Mr. Jeffers' conduct vis-à-vis his responsibilities as a union official.  These concerns included requests to return these very records to [Plaintiff] to stem any likelihood of just this type of abuse."  *See* Email attached as Exhibit 3.  President Holway read this email on November 22, 2005, the day after it was sent.  *Id.*

Shortly after this report, Plaintiff filed complaints with Defendant Holway, NAGE, the Local and PBGC via email.  *See* Exhibit 4.  Plaintiff's complaint, which was filed the day after Plaintiff learned of Jeffers' actions, specifically stated that it serves as a "formal complaint" of the misconduct committed by NAGE Local R3-77 and communicated to NAGE by email dated November 21, 2005.  *Id.*  Through the complaint, Plaintiff sought an "investigation" into the

4

"misfeasance, malfeasance and nonfeasance" committed by the Local through the conduct of its officers. *Id.* Plaintiff notes in the email that, "it is clear from the information shared with [Defendant Holway and NAGE's Chief Counsel]" that the conduct violated the Local's Bylaws as well as NAGE's own Constitution and Bylaws. *Id.* During the next several months, Plaintiff unsuccessfully beseeched Holway, NAGE and the Local to take action to retrieve and redress the dissemination of the highly private information contained in medical and personnel records. Am. Comp. at ¶ 28.

## ANALYSIS

A motion for reconsideration under Federal Rule of Civil Procedure 59(e) "need not be granted unless the district court finds that there is '. . . the need to correct a clear error or prevent manifest injustice.'" *See Bricker v. FBI*, 63 F. Supp. 2d 57, 58 (D.D.C. 1999) (*quoting Anayanwutaku v. Moore*, 151 F. 3d 1053, 1057-58 (D.C. Cir. 1998). Reconsideration of the March 7 Memorandum Opinion is sought to correct errors in fact and to prevent manifest injustice. *See National Trust for Historic Preservation v. Department of State*, 834 F. Supp. 453, 455 (D.D.C. 1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama Historical As's v. Christopher*, 49 F. 3d 750 (D.C. Cir. 1995).

Federal Rules of Civil Procedure 60(b) provides that a court may relieve a party from final judgment, order, or proceeding for a series of reasons including mistake, inadvertence, or any other reason "justifying relief from the operation of judgment." In this case, there are sufficient mistakes in the Court's March 7 Memorandum Opinion to warrant granting relief under Rule 60(b).

The Court based the findings in its Memorandum Opinion largely on a misunderstanding of the relationship between NAGE, the Local and the Plaintiff. The Local did not exist until it was created by NAGE. It is NAGE and not the Local that is certified as the exclusive representative of

the bargaining unit at PBGC. NAGE as the exclusive representative of the bargaining unit at PBGC delegated certain of its responsibilities to the Local. However, as noted in Plaintiff's First Amended Complaint, the Local operates within the framework of NAGE's Constitution and Bylaws. Am. Comp. at ¶ 2.

It is NAGE's status as the exclusive representative of the bargaining unit at PBGC that leads to its fiduciary duty and responsibility to the Plaintiff. [2] *See* Am. Comp. and *Johnson*, 439 F. Supp. 2d at 214 (President Holway testifying that he had a "fiduciary obligation" to the union and to the members of the union). The FLRA's September 28, 2007 referenced by the Court in its Memorandum Opinion notes that Plaintiff "has no independent right to arbitrate a grievance, only the parties to exclusive recognition have this right." Exhibit 5, p. 5. Where a union is acting as the exclusive representative of its unit members, the activities of the union must be undertaken without discrimination. *See Fort Bragg Ass'n of Educators, Nat'l Educ. Ass'n, Fort Bragg, N.C.*, 28 FLRA 908, 918 (1987). NAGE's status as the exclusive representative of the bargaining unit that Plaintiff belongs to is critical in this action.

Defendants confuse the focus of Plaintiff's First Amended Complaint and recite that NAGE "disclaimed any interest or responsibility for" Plaintiff's arbitration as if that fact somehow absolves NAGE of any and all responsibility for the arbitration. To the contrary, the arbitration was maintained by NAGE throughout the trusteeship. Indeed, the arbitration could not continue absent both the Local and NAGE acting to maintain it. Thus, Defendants' attempt to negate their responsibility for the arbitration fails on its face. More significantly, however, is the fact that NAGE's Arbitration Policy only addresses NAGE's obligation to provide legal representation and financial support for arbitrations it determines to be meritorious. This policy does not modify the

---

[2]   Indeed, NAGE is *still* the exclusive representative of the bargaining unit. The FLRA has not issued a ruling on NAGE's petition to withdraw from its status as the exclusive representative.

discipline procedures contained in NAGE's Constitution and Bylaws. Plaintiff's First Amended Complaint is clear that she sought assistance to address the *misconduct* of Mr. Jeffers related to his release of records from Plaintiff's arbitration. Plaintiff is not seeking to undo NAGE's decision denying any financial and legal support for her arbitration. Indeed, Plaintiff is satisfied that her success in proving that the claims raised in the arbitration had merit sufficient to result in a liability decision against PBGC shows that NAGE's assessment of her arbitration was wrong.

In this action, Defendants' attempt to negate any responsibility to its members in the Local, including the Plaintiff, stands in stark contrast to representations made in *Johnson*. In *Johnson*, these Defendants, represented by the same law firm, relied on NAGE's internal union disciplinary proceeding to defend against the *Johnson* plaintiffs' attempts to amend the complaint in that action. *See* Memorandum of Defendants in Opposition to Plaintiffs' Motion for Leave to Amend the Complaint, pgs. 4-6, attached as Exhibit 6. Defendants favorably cite caselaw that recognize a union's right to compel members to "follow certain prescribed practices, among which can be the requirement to exhaust available internal complaint processes before litigating against the union." *Id* (citation omitted). Defendants' went on to cite additional caselaw stating that this right "was designed to further LMRDA's purpose of achieving union democracy by giving unions a reasonable opportunity to correct abuses and by encouraging them to set up machinery for the prompt and fair disputation and review of disputes." *Id* (citation omitted).

The Court in *Johnson* held that Title I LMRDA rights are not unlimited because, *inter alia*, unions have the authority to "adopt and enforce" reasonable rules related to the responsibility of every member to refrain from conduct that would interfere with its legal or contractual obligations. *Johnson*, 439 F. Supp. 2d at 228 (citation omitted). NAGE vigorously defended its rules addressing the conduct of its members in the *Johnson* case. Indeed, its authority to take action to redress the

7

conduct of its members is foundational in NAGE's ultimate success in *Johnson*.[3]   The major

difference between Defendants' acts in the instant action when contrasted with its acts in *Johnson* is

that the Defendants were sued for their affirmative acts in *Johnson* and in this action they are being

sued for failing to act when they had a duty and obligation to do so.  Undeniably, NAGE could have

unilaterally taken action to address the conduct Plaintiff complained about.

Plaintiff did not request that NAGE impose a trusteeship on the Local.  Imposition of a

trusteeship is the ultimate act that NAGE and Holway could have taken in response to any violation

by a local and/or its members.  NAGE had, and still have, many options it can use in response to

complaints like the Plaintiff's.  In *Johnson*, NAGE and Holway disciplined two members who were

also former officers of the Local for violations of Article XII of NAGE's Constitution and Bylaws.

Notably, in this case, Defendants do not assert that they did anything at all in response to allegations

that members' rights to privacy and confidentiality were violated by a Local officer.  Defendants'

suggestion that Plaintiff's complaint did not warrant any action flies in the face of NAGE's own

Constitution and Bylaws and also of its actions in *Johnson*.

Defendants clearly appreciate the duty owed to the Plaintiff in the instant action.   The

spurious allegations to the contrary should not be rewarded with a dismissal of this action.  Indeed,

the conduct of Defendants in this action implicates Rule 11.  No matter how clearly emotional

Plaintiff's allegations are in her First Amended Complaint, Defendants are not excused from

abiding its own due diligence requirements in responding the Plaintiff's allegations.

---

[3]  Notably, the plaintiffs in *Johnson* not only obtained significant discovery in that action, but survived a summary
judgment motion and obtained a decision only after a bench trial.  Many of the issues raised by Defendants in this action
are more appropriate for a motion for summary judgment after Plaintiff has a fair opportunity to obtain discovery to
substantiate her claims.

## CONCLUSION

Plaintiff's First Amended Complaint states sufficient facts to allow this case to proceed to discovery so that the claims made in this action can have the same opportunity to develop the evidence necessary to prove the allegations it contains. Defendants misleading and confusing claims attempting to insulate NAGE from liability should not be allowed to succeed. Plaintiff requests that this Court reconsider and reverse its decision to dismiss this action against the Defendants.

Respectfully submitted,

Rhonda Baird, Pro Se
Plaintiff
13615 Layhill Road
Silver Spring, MD 20906
(301) 603-1641
rnbaird64@aol.com

9

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 21st day of March 2008, she filed a Request for

Reconsideration of the Court's March 7 Memorandum Opinion and served paper copies on the

following persons via first class mail:


W. Gray Kohlman, Esq.
Dora V. Chen, Esq.
Bredhoff & Kaiser, P.L.L.C.
805 15th street, N.W.
Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
Counsel for David Holway and National Association of Government Employees


Dwayne Jeffers
NAGE Local R3-77
1200 K Street, NW
Washington D.C. 20005

_____
Rhonda Baird

# EXHIBIT 1

# NATIONAL CONSTITUTION & BY-LAWS

## OF THE

# NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES

Adopted at the National Convention
September 17-20, 2002



# TABLE OF CONTENTS

|  | Page |
|---|---|
| Preamble | 3 |
| Mission Statement | 3 |
| Vision | 3 |
| To Achieve this Vision | 4 |
| Article I:  Name and Office | 5 |
| Article II:  Objectives and Purposes | 6 |
| Article III:  Organization | 7 |
| Article IV:  Local Units | 8 |
| Article IV A:  The Handling of Grievances | 10 |
| Article V:  Eligibility to Membership | 12 |
| Article VI:  Governing Body | 15 |
| Article VII:  National Officers | 17 |
| Article VIII:  National Executive Committee | 22 |
| Article IX:  National Executive Board | 23 |
| Article X:  Revenues | 25 |
| Article XI:  Bonding of Officers and Employees | 27 |
| Article XII:  Discipline of Locals and Members | 28 |
| Article XIII:  Non-Liability of National Union | 35 |
| Article XIV:  Delegates to International Convention of the SEIU | 36 |
| Article XV:  Amendments to the Constitution | 37 |
| SEIU/NAGE Members Bill of Rights and Responsibilities on the Job | 40 |
| SEIU/NAGE Member Bill of Rights and Responsibilities in the Union | 41 |
| Code of Ethical Practices | 42 |
| index | 44 |

## PREAMBLE

We who are employed by the Governments of the United States or Canada, or by the political subdivisions thereof or therein, or by any other business enterprise therein, do pledge ourselves to improve the general welfare of all employees, their families, and their dependents, and as almost every improvement in the condition of working people has been accomplished by the efforts of organized labor, and in the interest of a higher standard of citizenship, do ordain and establish these By-Laws and Constitution of the National Association of Government Employees.

## MISSION STATEMENT

We are the National Association of Government Employees (NAGE), an organization of members united by the belief in the dignity and worth of workers and the services they provide and dedicated to improving the lives of workers and their families and creating a more just and humane society.

We are public workers (federal, state, county, and municipal), police officers, correctional officers, health care workers (nurses, paramedics, and emergency medical technicians), office workers, professional workers, and allied workers. We seek a stronger union to build power for ourselves and to protect the people we serve.

Women and men of every race, ethnicity, national origin, religion, age, physical ability and sexual orientation, we are the standard-bearers in the struggle for social and economic justice begun nearly half a century ago by shipyard workers who dared to dream beyond their daily hardships and to organize for economic security, dignity and respect.

### *Our vision is of a society:*

Where all workers and their families live and work in dignity.

Where work is fulfilling and fairly rewarded.

Where workers have a meaningful voice in decisions that affect them.

Where workers have the opportunity to develop their talents and skills.

Where the collective voice and power of workers are realized in a democratic and progressive union.

Where union solidarity stands firm against the forces of discrimination and hate and the unfair employment practices of exploitative employers.

Where government plays an active role in improving the lives of working people.

### *To achieve this vision:*

We must bargain contracts that improve wages and working conditions, expand the role of workers in workplace decision-making, and build a stronger union.

We believe our strength comes from our unity, and that we must not be divided by forces of discrimination based on gender, race, ethnicity, national origin, religion, age, physical ability, sexual orientation or immigration status.

We believe our power and effectiveness depend upon the active participation and commitment of our members, the development of our leaders, and solidarity with each other and our allies.

We must organize the unorganized.

We must build political power to ensure that workers' voices are heard at every level of government to create economic opportunity and foster social justice.

We must provide meaningful paths for member involvement and participation in strong, democratic unions.

We must develop highly trained and motivated leaders at every level of the union who reflect the membership in all its diversity.

We must build coalitions and act in solidarity with other organizations who share our concern for social and economic justice.

We must engage in direct action that demonstrates our power and our determination to win.

To accomplish these goals we must be unified, inspired by a set of beliefs and principles that transcends our social and occupational diversity and guides our work.

We believe we can accomplish little as separate individuals, but that together we have the power to create a just society.

We believe unions are the means by which working people build power, by which ordinary people accomplish extraordinary things.

We believe we have a special mission to bring economic and social justice to those most exploited in our community, especially to women, minority groups, and workers of color.

We believe our future cannot be separated from that of workers in other parts of the world who struggle for economic justice, a decent life for their families, peace, dignity and democracy.

We believe unions are necessary for a democratic society to prevail, and that unions must participate in the political life of our society.

We believe we have a moral responsibility to leave the world a better place for our children and everyone's children.

4

# ARTICLE I

## NAME AND OFFICE

### SECTION 1.

This organization shall be known as the National Association of Government Employees affiliated with Service Employees International Union AFL-CIO, CLC and may also be referred to as SEIU/NAGE Local 5000 AFL-CIO.

### SECTION 2.

The Association shall maintain its headquarters at the place designated by the National Executive Board.

5

## ARTICLE II

## OBJECTIVES AND PURPOSES

The objectives and purposes of this National Union shall be to benefit its members and improve their conditions by every means, including but not limited to:

**A.** Securing of economic advantages, including better wages, hours and working conditions, through organizing, collective bargaining, legislative and political action, and the utilization of other lawful means;

**B.** By organizing and uniting in this National Union all working men and women eligible for membership herein;

**C.** By engaging in all such civic, social, political, legal, economic, cultural, educational, charitable, and other activities, whether on local, national, or international levels, as will advance this National Union's standing in the community and in the labor movement and further the interests of this organization and its membership, directly or indirectly;

**D.** By advancing and strengthening the rights of working men and women to bargain collectively;

**E.** By providing benefits and advantages to individual union members, officers, and employees through education, training, access to new technology, pensions, death, health, and welfare benefits;

**F.** By helping Local Unions to share experiences, pool resources, learn from each other's best practices, and be accountable to each other;

**G.** By cooperating with and assisting, by moral, monetary or other means, other labor organizations, whether or not affiliated with this National Union, or any other groups or organizations, having objectives which are in any way related or similar to those of this National Union, or which are of a nature beneficial to this National Union or to its members, directly or indirectly;

**H.** By strengthening and safeguarding this National Union by every lawful means so that it may carry out its purposes, objectives and obligations;

**I.** By utilizing, in every lawful way, including but not limited to every kind of use, expenditure and investment, the property and funds of this National Union, in order to achieve its purposes and objectives and perform its obligations, and for such other purposes directly or indirectly furthering the interests of this National Union and its members.

6

# ARTICLE III

# ORGANIZATION

## SECTION 1.

The National Association of Government Employees shall be organized for purposes of identification by Local Units. The National Executive Board may establish Local Units in the territorial Commonwealths and insular possessions of the United States and in foreign countries, and shall designate the divisions under which they shall be assigned.

## SECTION 2.

Local Units consisting of law enforcement personnel shall have a Division under this Constitution and By-Laws, known as the *International Brotherhood of Police Officers (IBPO)*; Locals consisting of personnel employed by the National Guard and the Army Reserve shall have a Division known as the *Army-Air Technicians Union (AATU)*; Locals consisting of personnel employed by correctional institutions shall have a Division known as the *International Brotherhood of Correctional Officers (IBCO)*; Locals consisting of personnel employed by federal, state, county, and municipal governments shall be *NAGE Locals*; Locals consisting of personnel employed as registered nurses shall have a Division known as the *National Association of Nurses (NAON)*; Locals consisting of personnel employed as health care employees shall have a Division known as the *National Health Care Union (NHCU)*; and Locals consisting of personnel employed as EMTs, paramedics, and other related emergency response employees shall have a Division known as the *International Association of EMTs and Paramedics (IAEP)*.

The National Executive Committee is empowered to create any additional Divisions or charter new locals, change or eliminate the existing Divisions to accurately reflect the membership of NAGE consistent with NAGE's jurisdiction. In addition, the National Executive Committee shall have the authority to approve the merger or consolidation of any Division or Local of NAGE.

7

## ARTICLE IV

## LOCAL UNITS

**SECTION 1.**
The National President with the approval of the National Executive Committee, may charter locals of this organization within any United States or Canadian political subdivision or private sector enterprise.

**SECTION 2.**
Those who desire to form a Local Unit shall make application to the National President. The National President with the National Executive Committee shall review such application, and upon their approval, the Charter Members will be notified by a National Executive Vice President.

**SECTION 3.**
Each Local Unit shall bear a number assigned by the National Executive Committee. Each Local Unit will be assigned to a Division.

**SECTION 4.**
Each newly authorized Local Unit may adopt as its Constitution and By-Laws, the Constitution and By-Laws of the National Association of Government Employees, unless such Local notices the National Executive Committee within thirty days after receipt of approval of its application from a National Executive Vice President of its intention not to adopt the National Constitution and within 180 days from the receipt of approval from the National President forwards a Constitution and By-Laws drawn and adopted by the Local consistent with the National Constitution and By-laws. No permanent charter will be issued until the requirements of this section are fulfilled.

**SECTION 5.**
Upon organization of a Local Unit the members shall elect a President, one or more Vice Presidents, a Treasurer and such other officers, as they shall deem advisable from the membership of the Local Unit. These Officers shall constitute the Local Unit Executive Board. Each Local Unit shall establish a quorum, but in no case shall the quorum be fewer than two (2) officers. Each Local Unit shall have an elected or Local President appointed Grievance Committee.

**SECTION 6.**
All officers of a Local Unit shall be elected by a plurality vote of the membership participating in the election who are eligible to vote. The election shall be by secret ballot not less than once every three years. Absentee ballots may be permitted subject to the regulations of the U.S. Department of Labor.

8

**SECTION 7**

No less than fifteen days prior to an election, notice thereof shall be mailed to each member at his last known home address. A reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office and shall have the right to vote for or otherwise support the candidate of his choice, without being subject to penalty, discipline or improper interference or reprisal of any kind by the Local Unit or by any member thereof. Each member eligible to vote shall be entitled to one vote. No member whose dues have been withheld by an agency pursuant to his voluntary authorization shall be declared ineligible to vote or to be a candidate for office by reason of alleged delay or default in the payment of dues. The votes cast shall be counted; the results published separately. The ballots and records pertaining to the election shall be preserved for one year.

No monies received by way of dues, assessments, or similar levy, shall be contributed or applied to promote the candidacy of any person in an election. However, such monies may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

**SECTION 8.**

All Local Units shall have at least one general membership meeting annually.

# ARTICLE IVA

# THE HANDLING OF GRIEVANCES

## SECTION 1.

Any person employed in a bargaining unit represented by a Local Unit of the National Association of Government Employees (hereinafter the "Grievant") shall have the following rights and shall employ the following remedies under the provisions of these Constitution and By-Laws if s/he believes that his Local Grievance Committee has acted improperly in handling his grievance under the Collective Bargaining Agreement.

## SECTION 2.

The Grievant, upon receiving notification from the Local Unit Grievance Committee, whether verbal or written, that the Committee has determined either to (1) reject his grievance; (2) settle the grievance; or (3) decline to further process the grievance to the next step of the grievance procedure shall take the following action to protect his rights:

**STEP ONE**: Grievant shall, within seventy-two (72) hours of notification of the Local Unit Committee's action complained of, notify member of the Grievance Committee in writing that the Grievant appeals the Committee's decision to the Local membership, unless the Local By-Laws provide that the grievance committee decision is final, in which case, the grievant shall proceed to Step Two.

(a) The Local Unit shall, if possible, immediately take the required action to protect the Grievant's rights under the Collective Bargaining Agreement by proceeding to the next step of the Grievance Procedure.

(b) The Grievant's appeal will be scheduled for hearing at the next regularly scheduled meeting of the Local Unit's membership.  If no regularly scheduled meeting of the Local Unit membership will occur before the next step of the grievance procedure (as provided in subsection (a) above) expires, the Local Unit Grievance Committee shall continue to protect the Grievant's rights by proceeding to the next further step of the grievance procedure, PROVIDED that the obligation of the Local Unit Grievance Committee to protect the Grievant's rights by proceeding to the next step of the grievance procedure shall NOT include the obligation to proceed to arbitration. At such hearing before the Local Unit membership, the Grievant and the Local Unit Grievance Committee will each be permitted a reasonable amount of time to present their respective positions. Thereafter, the matter shall be voted on by the members in good standing attending the Local Unit membership meeting and the decision by majority vote shall constitute a final determination as to whether or not to endorse Unit Grievance Committee's decision complained of.

(c) Subject to an Order of the National Officer under STEP TWO (c), if the membership of the Local supports the Local Unit Grievance Committee's decision, the Local Unit Grievance Committee shall not be required to take any further affirmative action to advance the grievance and said grievance will be processed in accordance with the Grievance Committee's initial decision.

10

(d) If the Grievant is not satisfied with the decision of the Local Unit's membership s/he may appeal to the National under STEP TWO.

**STEP TWO**: The Grievant, must notify the National Office, in writing, within three (3) business days following the decision of the Local Unit's membership, that s/he appeals the Local Units decision.

(a) Such appeal shall set forth a complete narrative as to the facts in support of the Grievance, a copy of the Collective Bargaining Agreement, the decision of the Local Unit Grievance Committee and whatever documents are reasonably necessary for an understanding of the case.

(b) The Appeal will be decided by a National Officer duly designated to act by the National President. Such National Officer, at his sole discretion, may (1) render a decision conducting whatever investigation s/he deems necessary or (2) refer the matter for decision to the National Executive Committee.

(c) The duly designated National Officer may, at any time, (1) order the Local Grievance Committee to take all steps necessary to protect the Grievant's rights under the Grievance Procedure pending the decision of the National Officer under STEP TWO (b) or (2) if the final decision under STEP TWO (b) is in favor of the Grievant, such National Officer shall order the Local Unit to take whatever actions s/he deems necessary to resolve the Grievant's complaint and to protect his/her rights under the Collective Bargaining Agreement.

**SECTION 3.**
Any member of a NAGE Bargaining Unit who believes that his or her grievance has been improperly handled by the Local Unit Grievance Committee or other authorized local bargaining agent shall, without exception, employ the remedies and procedures contained herein. No complainant shall be entitled to enforce or present his or her claim against NAGE or its Local subordinate in any Court or other administrative body without first exhausting these internal procedures.

11

## ARTICLE V

## ELIGIBILITY TO MEMBERSHIP

### SECTION 1.

A. Subject to the provisions of this Article V, any person shall be eligible for membership in this organization who is (i) employed by the governments of the United States or Canada, or the political subdivisions thereof or therein, or by any business enterprise therein; and (ii) pays all dues and maintains his or her dues on a current basis with the National Union.

B. Any person who is a member of NAGE as of October 1, 2002, may maintain his or her membership status, so long as he or she maintains the same employment status or has been unemployed from that status for less than 6 months. After October 1, 2002, new membership is only open to a person employed in a bargaining unit represented by NAGE or any person employed by or providing service as a staff member or as an elected officer of NAGE.

### SECTION 2.

There shall be no discrimination against any member, or any applicant for membership by reason of race, ethnicity, creed, color, religion, gender, marital status, sexual orientation, national origin, ancestry, age, or disability.

### SECTION 3.

No person may become a member of the National Association or any Local Unit who has, at any time, been found to be guilty of any conduct violative of Article XII, Sec. 1, of the National Constitution without obtaining a waiver of these provisions by the Executive Board of the Local Unit and the National Executive Committee.

### SECTION 4.

A member, upon retirement or separation from employment with federal, state, county, municipal or a political subdivision, government or corporation doing business with the federal, state, county and municipal government, or any other business enterprise, is entitled to become a retired member. However, members who retire and wish to retain NAGE insurance and other benefits at a reduced annual cost may do so. To qualify for reduced cost, such retiree must have been a member for five (5) or more years or a chartered member. Such retired member can attend local meetings but may neither vote nor hold local office unless he/she is a full dues paying member in good standing, and has received a waiver from the National Executive Committee.

**SECTION 5.**
Any member in good standing in a Local Unit, who has been assigned to the jurisdiction of another Local Unit, shall be entitled to a certificate from his original Local Unit, stating his membership and the duration thereof.

**SECTION 6.**
The National Association of Government Employees subscribes to the pertinent Executive Order, Labor Management Relations rules, regulations and laws governing the Federal "Standards of Conduct for Labor Organizations" and subscribes to comparable codes for states, counties, municipalities and their subdivisions as may be applicable.

**SECTION 7.**
No person shall use, conspire to use, or threaten to use force or violence to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of the National Association of Government Employees for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the pertinent rules, regulations, laws and Executive Orders referred to in Section 6.

**SECTION 8.**
The National Association of Government Employees prohibits its National and Local Unit officers and members from directly or indirectly through a spouse, minor child, or otherwise, from participating in business or financial interests which conflict with their duty to the Association.

**SECTION 9.**
No Local Unit or National Union shall directly or indirectly make any loan to any member or employee which results in a total indebtedness on the part of such officer, member or employee to the Association in excess of $2,000.

**SECTION 10.**
Nothing in this or any other provision of this Constitution shall prevent a Local Unit from investing funds in State chartered credit unions as well as Federal credit unions or in the Federally insured savings and loan associations, whenever such investments shall be authorized by a regular meeting of the local or by the National Executive Committee.

**SECTION 11.**
No member may resign from his membership in the National Association or subordinate body before he has paid all dues and other obligations due the National Association and all its subordinate bodies or during a period he is the subject of any disciplinary action described in Article XII and no resignation shall become effective until such payment is made or such disciplinary proceeding is completed unless the member shall have received the written approval as to his resignation from the National President.

**SECTION 12.**
The Code of Ethical Practices is incorporated herein by reference.

# ARTICLE VI

# GOVERNING BODY

## SECTION 1.

The legislative body of the National Association of Government Employees shall be the National Convention, and except as otherwise provided in this Constitution, the decisions of the Convention shall be by majority vote of the duly elected delegates in attendance.

## SECTION 2.

The Convention of the Association shall be held every four years at a time to be fixed by the preceding National Convention. In the event of a local or National emergency which renders the holding of a Convention impracticable, the National Executive Committee, by a majority vote, may postpone the holding of the Convention until such time as it may become practicable to hold a Convention. The date and location of the Convention will be left to the discretion of the National Executive Committee.

## SECTION 3.

The National President is authorized to appoint, with the approval of the National Executive Committee, such committees, and chairpersons thereof, as may be necessary to serve during the Convention.

## SECTION 4.

Rules and order of business governing the preceding Convention shall be in force from the opening of any Convention of the National Association of Government Employees until new rules have been adopted by action of the Convention.

## SECTION 5.

**A.** Each Local Unit shall elect a delegate or delegates to represent it at National Conventions. An elected delegate must be a member in good standing of the National Association but need not be a member of the Local Unit electing him as a delegate.

**B.** Election of delegates must be conducted by secret ballot. Notice of the election must be mailed to each member of the Local at his last known address, not less than 15 days prior to the election. Notice of nominations and elections may be combined provided that a reasonable time is allowed for nominations. The Local secretary shall preserve for one year the ballots and all other records pertaining to the election.

**C.** The Number of delegates allocated to each Local Unit shall be as follows: One delegate for 500 members or less, and one additional delegate for every 500 members or major fraction thereof up to five thousand members, and then one (1) additional delegate for every additional one thousand (1,000) members or major fraction thereof.

**D.** Local Unit Officers elected by secret ballot also may be voting delegates to intermediate or national bodies including National Conventions if the Constitution and

15

By-Laws of the Local Unit so provide. If the number of elected officers is less than the number of delegates, then arrangements shall be made for nominations in that Local Unit and secret ballot election, if required. If the total number of officers is greater than the number of delegates allowed, then officers shall attend as delegates in the order listed in the Local Unit By-Laws.

**E.** For the purpose of voting, the computation of membership for a Local Unit shall not include life members, retired members paying less than the full dues required for working members of their Local Unit, associate members or agency fee payers; but the computation of membership shall be based upon the full-time-equivalent represented by the Local Unit's dues payment to the National Union.

**SECTION 6.**
In the National Convention, each Local Unit shall be entitled to one vote for each ten members or fraction thereof, in good standing on the first day of the month of the National Convention.

**SECTION 7.**
A quorum for the transaction of business shall consist of at least twenty (20) delegates representing at least 25% of the total membership of NAGE.

**SECTION 8.**
A special National Convention of NAGE can be called by either:
**A.** The National President, with the approval of two-thirds of the members of the National Executive Committee; or
**B.** A majority of signatures of the members of each of twenty-five (25) locals, such total majority to represent ten (10) percent of the overall membership of NAGE.

# ARTICLE VII
# NATIONAL OFFICERS

## SECTION 1. COMPOSITION

**A.** The National Convention shall elect the National President and two (2) National Executive Vice Presidents, who shall be full time officers, and ten (10) National Vice Presidents, and thirty (30) National Executive Board members.

**B.** No member shall be eligible for nomination or election to National Office unless he or she has been a member of NAGE in continuous good standing for at least two (2) years immediately preceding the nomination and has during all of that time paid the full dues required for working members of the Local Union within each month when due. The International President may waive the foregoing requirements in his or her discretion for good cause shown.   All National Officers shall maintain such membership during their term of office and all National Officers shall pay their dues directly to the National Organization to fulfill the requirements of this section.

## SECTION 2. VACANCIES

Such officers shall serve until the election and installation of their successors at the succeeding National Convention. Vacancies in these offices occurring between National Conventions may be filled by nomination by the National President and approved by majority vote by the National Executive Committee to fill such vacancies.  Upon the vacancy in the office of National President, the National Executive Vice President who then currently has the greatest length of service on the National Executive Board, shall assume the Presidency and serve until the next National Convention.  Upon a vacancy of the National Executive Vice Presidents, the National President shall nominate from amongst the National Vice Presidents.  Said nominee shall be approved by the National Executive Board.

## SECTION 3. NATIONAL PRESIDENT—DUTIES AND POWERS

**A. (i)** It shall be the duty of the National President to preside at the Convention of the National Union and at meetings of the National Executive Board and National Executive Committee, and conduct them in accordance with parliamentary rules and in conformity with this Constitution.  Except as otherwise noted, the National President shall appoint all boards and committees and be an ex-officio member of same.  The National President shall hire all staff and set their compensation.

**(ii)** The National President shall act to the best of his/her ability in furthering the purposes and objectives of the organization and the interests of its members.

**(iii)** The National President shall have general supervision and direction over the affairs of the National Association.  The National President, or his/her designee, shall be authorized to call and make arrangements for such meetings, seminars and conferences as

17

he or she may deem necessary, and shall direct all departments, functions and programs of the National Association.

**(iv)** The National President, or his or her designee, shall have general supervision and direction of the organizing efforts of this National Association. The National President shall have power to appoint organizers, representatives, coordinators and organizing committees and to make such loans or grant such subsidies to Local Units and affiliated bodies as he/she deems necessary.

**(v)** The National President shall be empowered to employ necessary staff and retain counsel, accountants, staff and other professional personnel as he or she may require to assist in the duties of the office and to fix their compensation. He or she shall be empowered to fix the compensation of the National Executive Vice Presidents, National Vice Presidents and National Executive Board Members.

**(vi)** The National President shall have authority to decide on all points of law submitted to him or her by Local Units or the membership thereof, or by affiliated bodies, subject to appeal to the National Executive Board, and the next Convention.

**B.** Any member or officer of a Local Unit aggrieved by any action of his or her Local Unit or affiliated body not covered by the provisions of Article XII of this Constitution (including determinations of election protests) may petition the National President within fifteen (15) days after the act complained of, or may petition the National Executive Board, within fifteen (15) days after the action of the National President thereon, to review the action of the Local Unit or affiliated body. The President will endeavor to have a hearing held within thirty (30) days of the petition or protest, if the President deems a hearing to be necessary, and shall attempt to render his or her decision within thirty (30) days thereafter.

**C.** The National President shall sign all charters and other official documents of this National Union; shall have the authority to direct an examination of the books and records of any Local Unit or affiliated body; and shall draw vouchers on the Chief Financial Officer for such sums of money as his or her activities require.

**D.** All vouchers of the National Union shall be submitted to the National President for approval. The National President may at any time appoint a member of the Board of Auditors or such other representative or accountant as he or she may designate to examine any matter affecting the finances of the National Union.

**E.** The National President shall appoint three (3) Auditors as a Committee, and designate a Chair. Auditors shall be members of the Union. The duties of the Auditors Committee shall be to estimate the revenues of the Union, present it to the National Executive Board for approval and make recommendations for the allocation of funds and other recommendations related to the finances of the Union. The Auditors shall make a yearly

audit of the Chief Financial Officer immediately following the close of each fiscal year, and at such other times as the President or National Executive Board shall deem necessary. The Auditors may retain such accountants' services as they deem advisable. Copies of the statement of condition and of the annual audit report shall be furnished to members of the National Executive Board and mailed to each Local President and shall be distributed to the members. The Auditors shall also perform such other duties as are usually incidental to their office. Once appointed, said auditors shall serve until the next Convention, and their compensation shall be set by the National President. They may be removed only by a two-thirds (2/3) vote of the National Executive Board.

**F. (i)** Whenever the National President has reason to believe that, in order to protect the interests of the membership, it is necessary to appoint a Trustee for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objectives of this National Union, he or she may appoint such Trustee to take charge and control of the affairs of a Local Unit or of an affiliated body, pursuant to the procedures established in Article XII of this Constitution and Bylaws.

**(ii)** The National President may appoint a representative to meet with the officials of Local Units or affiliated bodies and to attend any meetings of Local Units or affiliated bodies where in the judgment of the National President there is a need to assist the Local Units or affiliated bodies with respect to their internal needs. The National President may appoint a hearing officer to examine the internal needs of the Local Officers, Unit or affiliated body, and to assist them in determining what remedial action(s), if any, should be implemented by the Local Unit or affiliated body. At any time, the National President also may designate his/her representative as a Monitor with additional oversight responsibility to review compliance with the National President's recommendations and/or otherwise assist in addressing the internal needs of the Local Unit or affiliated body. Among the internal needs to be considered is whether a Local Unit or affiliated body has met applicable standards endorsed by the National Convention or satisfied such procedures, rules and/or regulations duly adopted by the National Executive Committee to carry out the goals set by the National Convention.

**G.** The National President shall have authority to call upon any and all officers for assistance and advice when the occasion demands or requires it.

**H.** The National President shall make a full report to each National Convention and at all Executive Board meetings.

## SECTION 4. NATIONAL EXECUTIVE VICE PRESIDENTS
The National Executive Vice Presidents shall act as representatives of the National President on all matters referred to them by him/her and shall be members of the National Executive Committee. The Executive Vice Presidents shall perform such duties as are assigned to them by the National President. They shall work under the supervision of the

National President, and their compensation shall be set by the National President. The National President, with a two-thirds (2/3) vote of the National Executive Board, may create additional National Executive Vice Presidents as they deem appropriate.

## SECTION 5. CHIEF FINANCIAL OFFICER.

**A.** The National President shall appoint and supervise a Chief Financial Officer. His/her compensation shall be set by the National President. The National President may delegate to the Chief Financial Officer the authority to perform the duties outlined in the following subsections, always subject to the approval and supervision of the National President.

**B.** The Chief Financial Officer shall be a person who shall possess the necessary education and experience required to fulfill his/her duties.

**C.** The Chief Financial Officer shall serve from National Convention to National Convention and may be removed from office only by a majority vote of the Executive Board.

**D.** The Chief Financial Officer shall keep a correct record of all the proceedings of the National Convention, National Executive Board, and the National Executive Committee. He or she shall have the custody of and maintain the papers and other documents and effects of the National Association and the preceding National Convention. S/He shall maintain the papers and documents of the National Association. S/He shall conduct the correspondence pertaining to the general office and the Executive Committee.

**E.** The Chief Financial Officer shall receive and collect all monies due to the National Union. All funds shall be deposited in a bank in the name of NAGE, subject to an order signed by the National President and one of the Executive Vice Presidents. At the request of the National President, the National Executive Committee shall authorize in writing one or more other National Executive Committee members to sign all checks covering expenditures of NAGE, upon the co-signature of the National President or National Executive Vice President.

**F.** The Chief Financial Officer shall maintain records of the membership of the National Union and shall report to the National President and the National Executive Board as required. He or she shall keep all membership records and application cards, and a record of all members admitted by initiation or otherwise, as well as rejections and suspended or expelled members. He or she shall send to the International Union an accurate record of all dues payments and other revenue and he or she shall forward to the International Secretary-Treasurer of the International Union and to any state council with which it is affiliated the correct names and addresses and Social Security or social insurance numbers (including e-mail address and phone number, if available) of all members initiated or readmitted, and of all other persons from whom revenue is derived, as well as those suspended for non-payment of dues or for any other cause; also a correct

20

list of those who take transfer or withdrawal cards.  The proper zip code shall be included for each address.

**G.** The Chief Financial Officer shall with the approval of the National President and subject to policies approved by the National Executive Committee, invest any surplus funds of the Association. In making such investments in all cases, such investments shall be made in accordance with the 'Prudent Man Rule.'' In addition to the foregoing powers and discretion, the Chief Financial Officer is authorized to purchase certificates of deposit, securities of United States corporations, commercial notes, bonds, shares of common stock and to make investments in the securities of registered investment companies. In connection with the investments of the Association, the Chief Financial Officer is authorized, subject to the approval of the National Executive Committee, to pay the reasonable fees and expenses of any bank or investment counselor for advice with respect to such transactions.

**H.** The Chief Financial Officer shall make a full report of all matters relating to his or her office to the National Executive Board, and said report shall be presented at each National Convention.  In addition, the Chief Financial Officer shall, no less frequently than on a quarterly basis, make a full report of all financial transactions of NAGE to the National Executive Committee.

**I.** The Chief Financial Officer shall, upon termination of employment, turn over to his or her successor in office all books, monies, property and other belongings of the National Union.

**J.** The Chief Financial Officer shall keep all records pertaining to income, disbursements, and financial transactions of any kind for a period of at least six (6) years, or longer if required by applicable law. He shall obtain an outside certified financial audit of NAGE on an annual basis.

**K.** The Chief Financial Officer shall furnish to the Auditors all records they request.

**L.** The Chief Financial Officer shall have the authority to direct an audit of the books and financial records of any Local Unit to determine its financial status whenever it is deemed advisable or when in his/her opinion a Local is not remitting per capita tax on the membership to which the National Association is entitled.

21

## ARTICLE VIII

## NATIONAL EXECUTIVE COMMITTEE

**SECTION 1.**
A National Executive Committee shall be established and be comprised of the National President, two National Executive Vice Presidents, and ten (10) National Vice Presidents, elected at the National Convention.

**SECTION 2.**
In connection with an affiliation or merger of another labor organization, the National Executive Board may grant to such labor organization until the next National Convention such executive positions and/or representation on the National Executive Committee or National Executive Board in the form of additional National Vice Presidents and National Executive Board members in excess of the numbers provided in this Article and Article IX.

**SECTION 3.**
The National Executive Committee shall meet at least every other month or otherwise at the direction of the National President. Yearly, at least two of the National Executive Committee meetings shall coincide with the National Executive Board meetings. The National Executive Committee's function will be to advise the National President on any and all matters relating to members engaged in the various functions in which the Committee delegates are involved. The term of office of each National Vice President will run from Convention to Convention. The Chairman of the National Executive Committee shall be the National President.

**SECTION 4.**
A Quorum of the National Executive Committee shall be seven (7) members.

**SECTION 5.**
The National Executive Committee shall elect a subcommittee of three (3) members from amongst its membership to set the salary of the National President and to make a recommendation of the salary of the National President to the National Executive Committee. Said recommendation shall be voted upon by the National Executive Committee.

**SECTION 6.**
Between National Conventions, the Executive Committee shall have the authority to take such steps it determines are needed to insure that the NAGE shall be able to meet its obligations.

22

ARTICLE IX

NATIONAL EXECUTIVE BOARD

SECTION 1.

A National Executive Board is hereby established comprised of the National Executive Committee and thirty (30) Executive Board Members. National Executive Board Members shall be elected at the National Convention. Vacancies and additions to the National Executive Board will be filled by a nomination of the National President upon majority vote of the National Executive Board.

SECTION 2.

The National Executive Board shall meet at least semi-annually or otherwise at the direction of the National President, within twenty-four (24) hours after adjournment of the National Convention, within ten (10) days after the written request of eight (8) or more members of the National Executive Committee, and immediately preceding the holding of the succeeding National Convention. The National Executive Board's function will be to advise the National President and the National Executive Committee on any and all matters relating to members engaged in the various functions and Sub-Committees in which the National Executive Board Members are involved. The term of office of each Board Member will run from Convention to Convention.

SECTON 3.

The National Executive Board shall annually approve the budget for the operation of the Union. The National Executive Board shall annually formulate and approve an annual organizing plan for the Union. The National Executive Board shall annually formulate and approve an annual education and communication plan for the Union. The National Executive Board shall annually formulate and approve an annual political strategy for the Union.

SECTION 4.

The Sub-Committees of the National Executive Board shall be: *Audit Sub-Committee, Budget Sub-Committee, Education/Communication Sub-Committee, Organizing Sub-Committee, and Political Strategy Sub-Committee.* All Sub-Committees shall be appointed by the National President with the majority vote of the National Executive Board. Additional Sub-Committees may be created by the National President with the majority approval of the National Executive Board. The President shall designate all Chairs and Co-Chairs of all Sub-Committees.

SECTION 5.

A majority of the members shall constitute a quorum of the National Executive Board. When the National Executive Board is not in meeting and the National President deems it necessary for the National Executive Board to act promptly, a National Executive Vice President shall poll the National Executive Board and such action and vote may be taken by telephone, email, letter, fax, telegram or teletype. Such action so taken on vote of two-

thirds (2/3) of the members of the National Executive Board shall constitute official action of the National Executive Board.

**SECTION 6.**
The National Executive Board shall have the authority to authorize a housing program for the benefit of the Union.

**SECTION 7.**
The purchase and sale of (1) all motor vehicles; (2) all real estate; (3) all tangible property in excess of $75,000; and (4) the approval of any and all non-personnel related contracts in excess of $75,000.00 shall require the approval of the National Executive Board.

## ARTICLE X

## REVENUES

**SECTION 1.**
The financial records of the National Office and the Local Units shall be kept on a fiscal year basis. The fiscal year shall begin September first (1st) and end on August thirty-first (31st).

**SECTION 2.**
The revenue of the Association shall be derived from membership dues and from such other sources as may be approved by the National Convention and implemented by the National Executive Committee.

**SECTION 3.**
Local Units meeting the requirements of voluntary dues allotments (Dues Check-Off) will sign an agreement with their Agency whereby the Agency will deduct the specified dues and make all payments directly to:

**CHIEF FINANCIAL OFFICER, FISCAL OFFICE**
**NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES**
**159 BURGIN PARKWAY**
**QUINCY, MASSACHUSETTS 02169-4213**

or such other address as the Chief Financial Officer shall designate to each Local Unit by written notice.

**SECTION 4.**
The dues structure of the Union and any division thereof shall not be changed except by a majority vote of duly constituted delegates to a regularly scheduled or special National Convention, or by a seventy five percent (75%), or more, vote of the National Executive Board.

**SECTION 5.**
Between National Conventions, the National Executive Board shall have the authority to take such steps it determines are needed to insure that the NAGE shall be able to meet its obligations.

**SECTION 6.**
Upon receipt of said dues, the Chief Financial Officer will return to said Local (every month for the previous month) the Local's Per Capita. Per Capita shall be paid at the rate of $3.00 per member, per month, based on full-time-equivalents. Any Local Unit may notify the Chief Financial Officer to suspend Per Capita payments to said Local Union.

**SECTION 7.**

Any Local Unit which fails to pay the said dues on or before the fifteenth day of each month shall be notified by the Chief Financial Officer, and if at the end of three months thereafter it is still in arrears, it may become suspended from membership. Any Local Unit remaining suspended for six months may be required to surrender its charter to the Chief Financial Officer and forfeit all rights and privileges in this Association.

**SECTION 8.**

A suspended Local Unit may be reinstated in this Association upon payment of all arrearage; provided, however, that the National President shall, in exceptional cases, have the power to remit or abate such arrearage in whole or in part when circumstances warrant such action.

**SECTION 9.**

Local Units shall conduct an audit on an annual basis. A copy of such audit shall be furnished to the Chief Financial Officer no later than forty-five (45) days after the fiscal year as defined in Section 1 of this Article

**SECTION 10.**

The Chief Financial Officer shall have the authority to direct an audit of the books and financial records of any Local Unit to determine its financial status whenever it is deemed advisable or when in his/her opinion a Local is not remitting per capita tax on the membership to which the National Association is entitled.

**SECTION 11.**

The Chief Financial Officer shall at the appropriate time each year, cause to be mailed to the Treasurer of each Local Unit, appropriate financial reporting forms of the U.S. Department of Labor and the Internal Revenue Service. The proper officers of each Local Unit are required to complete such required forms for each fiscal year ended and send copies of such forms duly executed to the Chief Financial Officer. The Chief Financial Officer shall after review of such financial forms, cause them, where applicable, to be filed with the U.S. Department of Labor and the Internal Revenue Service. In the event that any Local Unit shall not comply with the provision of this Section 11, the Chief Financial Officer, at his/her sole and unfettered discretion, shall be authorized to withhold the payment of per capita taxes to pay the delinquencies of the Local Unit until such time as the Local Unit shall comply with its obligations under this Section 11.

## ARTICLE XI

## BONDING OF OFFICERS AND EMPLOYEES

### SECTION 1.

Every National Officer and every employee of the National Association who handles funds or other property of the National shall be bonded, with a recognized surety company, in accordance with the provisions of Section 502(a) of the Federal Reporting and Disclosure Act of 1959, as amended. The bond of each such person shall be fixed at the beginning of the National's fiscal year and shall be in an amount not less than ten (10%) percent of the funds handled by such person and his predecessor or predecessors, if any, during the preceding fiscal year of the National, but in no case more than $500,000.

### SECTION 2.

Except with respect to a Local Unit whose property or annual receipts does not exceed $5,000 in value, every officer, agent, or employee of any Local handling funds or other property of such Local shall be bonded in the same manner as provided for National Officers and employees of the National Association under Section 1 of this Article XI.

27

# ARTICLE XII

# DISCIPLINE OF LOCALS AND MEMBERS

## SECTION 1.

**A.** Local officers or members may be charged with the following:

(1) Violation of any specific provision of this Constitution, or of the By-Laws of the Local Unit;

(2) Violation of the oath of loyalty and/or their duty to the International Union, NAGE, the Local Unit, and/or the members thereof;

(3) Misfeasance, malfeasance, or nonfeasance such that they have breached their duty to the International, NAGE, the Local unit, and/or the members thereof;

(4) Disloyalty or conduct unbecoming a member;

(5) Financial malpractice;

(6) Corrupt or unethical practices or racketeering;

(7) Advocating or engaging in dual unionism or secession;

(8) Disobedience to the regulations, rules, mandates and decrees of the International Union or NAGE or the Local Unit;

(9) The wrongful taking or retaining of any money, books, papers or any other property belonging to the International Union, NAGE or Local Unit; or the wrongful destruction, mutilation or erasure of any books, records, bills, receipts, vouchers or other property of the National Union or the Local Unit;

(10) Working as a strike breaker or violating wage or work standards established by the International Union or NAGE or a Local Unit;

(11) The bringing of false charges against a member or officer without good faith or with malicious intent;

(12) Failing to pay his or her proper union membership dues, or failing to remit proper dues from the local to the National;

(13) Discrimination or advocacy of forbidden discrimination against any other member on the basis of race, ethnicity, creed, color, religion, gender, marital status, sexual orientation, national origin, ancestry, age, or disability.

If such charges are substantiated in accordance with the procedures established hereafter, such remedial and/or punitive action can be taken as is justified and in the best interest of the organization and its members.

**B.** Disciplinary action, up to and including the imposition of trusteeship or the dissolution of the local unit, may be taken:

(1) When a local, through misfeasance, malfeasance, or nonfeasance fails to meet its duty of fair representation to its members;

(2) When a local fails to meet its financial obligations to the National, or to any other vendor or obligee.

(3) When the local fails in its duty to its membership;

(4) When the Local fails to preserve and protect its assets, fails to meet its legal obligations, or fails in any other duty such that its obligations to the members, the National, the International, or the Local itself are not being met.

**C.** For the purposes of this document, the following words are defined as follows:
1. "Misfeasance" - The improper performance of an act(s) which a person is supposed to do.
2. "Malfeasance" - The doing of an act(s) which a person is not supposed to do at all.
3. "Nonfeasance" - The omission of or failure to perform an act(s) which a person is supposed to do.

**SECTION 2:**
Charges Brought by Member(s) of a Local Unit and Determined at the Local Level:

**A.** Charges alleging any conduct described in Sections 1 A or B above on the part of any member or officer of a Local Unit shall be filed in duplicate with the Secretary of the Local Unit, who shall serve a copy thereof on the accused either personally or by registered or certified mail, directed to the last known address of the accused, at least ten (10) days before the hearing upon the charges. The Local Unit President shall send a copy of this notice to the National President. The charges must specify the events or acts which the charging party believes constitute a basis for charges and must state which subsection(s) of Section 1 of this Article the charging party believes have been violated. If the charges are not specific, the trial body may dismiss the charges either before or at the hearing, but the charging party shall have the right to re-file more detailed charges which comply with this Section. No charges may be filed more than six (6) months after the charging party learned, or could have reasonably learned, of the act or acts which are the basis of the charges.

**B.** The Executive Board of the Local Unit shall act as the Trial Body, unless the Constitution and By-Laws of the Local Unit provide for another trial procedure. The accused may appear in person and with witnesses to answer the charges against him/her and shall be afforded a full and fair hearing. The person charged may select any person to act as his/her advocate unless otherwise limited by the Local Constitution and By-Laws.

**C.** If any portion of the charges are sustained by the evidence, then the trial body shall render such judgment and impose such discipline that it considers just. If the charges are not sustained, they shall be dismissed, and the accused shall be restored to full rights of membership and/or office.

**D.** If the charges brought are against a member(s) of the Local Executive Board or Trial Body, that person(s) charged shall not sit as a member of that body for the purpose of deliberating on the charges. If this results in an insufficient number of persons to constitute a quorum (or if no definition of "quorum" has been established by the Local, a majority) of the Trial Body, the parties shall agree to a method of establishing a fairly

constituted panel to determine the sufficiency of the charges and to issue a judgment. If the parties cannot agree, either party may submit that issue to the National President by contacting the Executive Secretary in writing. The National President shall determine the method of establishing a fairly constituted panel, or shall order that the National take immediate jurisdiction.

**E.** If the accused is unable or unwilling to be present at any hearing provided for herein, a defense may be presented in writing. In default of appearance or defense, the Trial Body shall proceed with the hearing regardless of the absence of the accused.

**F.** The Trial Body, after requisite due process has been afforded, may impose such penalty as it deems appropriate and as the case requires. The National President shall be notified of the Hearing Decision.

**SECTION 3:**
Charges Brought by or Action Taken by National President

**A.** Regarding individual members:
**(i)** When and if the National President finds that by action or inaction any individual officer(s) or member(s) have engaged in, are engaging in, or are about to engage in conduct which constitutes one or more of the offenses found in Section 1 A (1) - (13) above, he shall have the authority to take such action as is warranted to insure that the NAGE, its Locals and its members are not subjected to harm or the risk thereof. He shall have the authority to take any and all acts he deems just and necessary, including but not limited to those found in Article XII, Section 2.

**(ii)** When and if the National President determines that it is appropriate for him to invoke the powers provided him in the above subsection, he shall first cause to be issued a notice, advising the officer(s) or member(s) against whom such action is contemplated that such action is, in fact, contemplated, the reasons for such contemplated action, and a citation to the specific section(s) of this Constitution which he considers has been violated. Said notice shall establish a time and place for a hearing on these charges, which can be held before the National President or before such person as he or she should designate. Said hearing shall be held within thirty (30) days of the issuance of the notice and be held in a reasonable place and at a reasonable time. A decision shall issue within sixty (60) days following the conclusion of the hearing. At such hearing, the party against whom such action is contemplated shall have the opportunity to answer said charges, to offer defenses, and to otherwise dispute that just cause exists for the action contemplated.

**(iii)** If, in the judgment of the National President, an emergency situation exists, he can invoke the power provided him in Subsection 3 A. (1) and take any and all acts s/he deems just and necessary, including but not limited to those found in Article XII, Section 2. If the National President invokes the authority granted him under this subsection, s/he

shall, within thirty (30) days after having taken such action, cause a hearing to be held. At such hearing, the party against whom such action has been taken shall have the opportunity to answer said charges, to offer defenses, and to otherwise dispute that just cause exists for the action taken. Notice of the date, time, and place for said hearing shall be sent to the party against whom such action was taken within ten (10) days after the action was taken. A decision shall issue within sixty (60) days following the conclusion of the hearing.

**B.** Regarding Local Units:
**(i)** When and if the National President finds that one or more of the conditions found in Section 1 B. (i) - (iv) exist within a local, s/he shall have the authority to appoint a trustee to take charge and control of the affairs of such local.

**(ii)** When and if the National President determines that it is appropriate for him to invoke the powers provided him in the above subsection, s/he shall first cause to be issued a notice, advising the officers of the Local against whom such action is contemplated that such action is, in fact, contemplated, the reasons for such contemplated action, and a citation to the specific section(s) of this constitution which s/he considers has been violated. Said notice shall establish a time and place for a hearing on these charges, which can be held before the National President or before such person(s) s/he should designate. Said hearing shall be held within thirty (30) days of the issuance of the notice and be held in a reason able place and at a reasonable time. A decision shall issue within sixty (60) days following the conclusion of the hearing. At such hearing, the officers and members of the local against whom such action is contemplated shall have the opportunity to answer said charges, to offer defenses, and to otherwise dispute that just cause exists for the action contemplated.

**(iii)** If, in the judgment of the National President, an emergency situation exists, s/he can invoke the power provided him in Section 3 B. If the National President invokes the authority granted him under this subsection, s/he shall, within thirty (30) days after having taken such action, cause a hearing to be held. At such hearing, the officers and members of the Local against whom such action has been taken shall have the opportunity to answer said charges, to offer defenses, and to otherwise dispute that just cause exists for the action taken. Notice of the date, time, and place for said hearing shall be sent to the officers of the local against whom such action was taken within ten (10) days after the action was taken. Said hearing shall be held within thirty (30) days following the taking of the action, and a decision shall issue within sixty (60) days following the conclusion of the hearing.

**(iv)** Upon the imposition of a trusteeship, either under the provisions of Subsections (ii) or (iii) above, the trusteed Local and the officers and members thereof shall cooperate with the Trustee designated by the National President, in order that the purposes of the trusteeship may be accomplished as soon as possible. The Trustee shall be authorized to take full charge of the affairs of the Local, to appoint temporary officers or employees at any time during the trusteeship, and to take such other action as in the trustee's judgment

31

is necessary for the good of the local and its interests. The Trustee shall report on the affairs/transactions of the Local Unit or affiliated body to the National President. The Trustee and all of the acts of the Trustee shall be subject to the supervision and direction of the National President. The National President may remove Trustees at any time and appoint successor Trustees.

(v) The trustee, temporary officers, and persons employed to carry on the affairs of said local, during the period of such trusteeship, shall give bond in such form and amount as may be necessary to indemnify against possible financial loss.

(vi) The Trustee shall take possession of any such funds, books, records. and papers of the Local and tender receipt for same. He or she shall pay all outstanding claims, properly proved, promptly, if funds are sufficient. NAGE shall not be responsible for any actions or activities of a Local unless such actions or activities have been directed or authorized by the Trustee.

(vii) The Trustee is authorized, upon presentation of notice of imposition of temporary trusteeship by the National President, to notify any financial institution where the assets of the subordinate Local are kept or deposited that the Trustee or the designee of same shall have exclusive dominion and control over the assets of the subordinate body, including but not limited to authority to remove said assets from said institution.

(viii) When it is determined by the National President or the Executive Committee that self-governing should be restored, the Trustee shall conduct an election at such time as s/he shall designate, in conformity with the provisions of the Local's Constitution as far as s/he deems practical and, upon installation of officers, the trusteeship shall terminate. When self-government is restored, the Trustee shall return all funds, books, papers and other property to the Local Unit or affiliated body. If, however, the Local Unit or affiliated body is dissolved by the revocation of its charter, then any balance remaining to the credit of the Local Unit or affiliated body shall be forwarded to NAGE and shall become the property of the National Union.

(ix) In case of the dissolution or the expulsion of a Local Unit or an officer of a Local Unit or of a National Officer, all funds, properties, books and assets belonging to the Local Unit, or the National Association, which are or might be in the possession of the Local Unit or an officer of the Local Unit, or the National Officer, shall be turned over to a duly authorized representative of the National Association of Government Employees designated by the National President or the National Executive Committee and the National Association of Government Employees shall have the right to possession of such properties, books and assets. All such funds, properties, books and assets received by the National Association shall be held in trust by it until such time as such Local Unit which has been dissolved or expelled is either reconstituted, recharged or reorganized, at which time such funds, properties, books and assets shall be returned to such reconstituted Local Unit; provided, however, that if such Local Unit is not reconstituted,

rechartered or reorganized within a period of two (2) years from the time such funds, properties, books and assets are received by the National Association, such funds, properties, books and assets shall become the property of said National Association of Government Employees.

## SECTION 4- Appeals:

Any person or body against whom disciplinary action has been taken or whose charges have been dismissed in whole or in part shall have the right to appeal as follows:

**A.** An appeal to the National Executive Committee may be taken by either the accused or the member filing the charges from any decision of a Local Unit with respect to such charges provided such decision is a final decision under the terms of the Constitution and By-Laws of the Local Unit. Any such appeal must be filed in writing with the National Executive Secretary by registered or certified mail, within fifteen (15) days after the decision. No specific form or formality shall be required, except that such appeal shall clearly set forth the decision being appealed and the grounds for the appeal. During the pendency of any appeal, the decision being appealed from shall remain in full force unless it is stayed by the National Executive Committee. The National Executive Committee may decide the appeal on the records made by the Trial Body or may, in its discretion, upon at least ten (10) days notice, hear argument or hold a rehearing either itself or before a hearing officer or officers designated by it. The National Executive Committee may confirm, reverse or modify the decision appealed from.

**B.** An appeal to the International Executive Board may be taken by either the accused or the member filing the charges from any decision of the National Executive Committee with respect to such charges provided such decision is a final decision under the terms of the Constitution and By-Laws of the NAGE, or from a decision of the International President. Any such appeal must be filed in writing with the International Secretary-Treasurer, by registered or certified mail, within fifteen (15) days after the decision. No specific form or formality shall be required, except that such appeal shall clearly set forth the decision being appealed and the grounds for the appeal. During the pendency of any appeal, the decision appealed from shall remain in full force, unless it is stayed by the International Executive Board. The International Executive Board may decide the appeal on the record made by the Trial Body or may, in its discretion, upon at least ten (10) days notice, hear argument or hold a rehearing either itself or before a hearing officer or officers designated by it. The International Executive Board may affirm, reverse or modify the decision appealed from.

**C.** Appeals from any decision of the International Executive Board with respect to charges may be taken to the next International Convention. Any such appeal shall be filed in the same manner and within the same time as appeals to the International Executive Board. During the pendency of such appeal, the decision appealed from shall remain in full force. The appellant shall have the right to appear before an appeals committee of the Convention and, if the appellant is a Local Unit or a member appealing

33

an expulsion from membership, shall have the right to appear before the Convention itself only with the consent of the Convention. The action of the Convention on all appeals shall be final and binding.

**SECTION 5- Appeals of Elections:**
Any member of a Local may use the following procedure to appeal the results of an election for Local Officers and delegates to the National Convention. Within fifteen (15) calendar days after the tally of ballots has been furnished to the members of the Local, any member of that Local may file objections to the conduct of the election or conduct affecting results of the election to the Local's Executive Committee or Board of Directors. Objections must be made in writing and must contain specific reasons in support thereof.

**SECTION 6- Exhaustion of Administrative Remedies:**
Subject to the provisions of applicable statutes, every Local Unit or member or officer thereof or officer of the National Union against whom charges have been brought and disciplinary action taken as a result thereof or who claims to be aggrieved as a result of adverse rulings or decisions rendered, agrees, as a condition of membership or affiliation and the continuation of membership or affiliation, to exhaust any remedies provided for in the Constitution and By-Laws of the International Union, of the National Union, and of the Local Unit and further agrees not to file or prosecute any action in any court, tribunal or other agency until those remedies have been exhausted.

**SECTION 7:**
The SEIU Member Bill of Rights and Responsibilities in the Union shall be enforced exclusively through the procedures provided in this Article and any decision rendered pursuant to the procedures provided for herein, including any appeals, shall be final and binding on all parties and not subject to judicial review.

34

**ARTICLE XIII**

**NON-LIABILITY OF NATIONAL UNION**

Except as is otherwise specifically provided in this Constitution, no Local Unit, or affiliated body, nor any officer, employee, organizer or representative of a Local Unit or affiliated body or of this National Union shall be authorized to make contracts or incur liabilities for or in the name of the National Union unless authorized in writing by the National President and the National Executive Board.

## ARTICLE XIV

## DELEGATES TO INTERNATIONAL CONVENTION OF THE SERVICE EMPLOYEES INTERNATIONAL UNION

**SECTION 1.**
The convention of the SEIU International Union meets every four (4) years and will convene sometime during the months of April, May, June or July at such time and place as the SEIU International Executive Board may determine.

**SECTION 2.**
Special SEIU conventions may be called upon order of the SEIU International Executive Board to convene at such time and place as the Board may determine, and any and all business, including appeals from suspensions and decisions of the SEIU International Executive Board, may come before such special convention unless specifically limited by the call. Notice of such call shall be given to each Local at least sixty (60) days prior to the date of the special convention. All other provisions of Article IV of the International Constitution shall control all special conventions.

**SECTION 3.**
The NAGE delegates to the International Convention shall be selected in accordance with the SEIU Constitution and applicable law.

36

# ARTICLE XV

## AMENDMENTS TO THE CONSTITUTION

**SECTION 1.**
All proposed resolutions and proposed amendments to the NAGE Constitution and Bylaws must be submitted by a NAGE Local Union to the NAGE National Executive Committee at least thirty (30) days prior to the Convention except that proposed resolutions and proposed amendments not so submitted may be considered by the Convention upon unanimous consent of the delegates present. Three copies of each proposed resolution and amendment should be submitted to the NAGE National Executive Committee. The NAGE National Executive Committee may present proposed resolutions and constitutional amendments to the Convention at any time during the Convention without the requirement of unanimous consent. Amendments and resolutions shall be considered adopted upon majority vote.

**SECTION 2.**
Amendments to the National Constitution and By-Laws which shall not have been presented as prescribed in Section 1 of this Article, may be proposed at the National Convention, but adoption shall be only on or with the two-thirds vote of the total authorized representation at said Convention.

**SECTION 3.**
Amendments by referendum. Any Local Unit of the National Association of Government Employees and/or the National President with the approval of the National Executive Committee may prepare and circulate a petition for the purpose of causing a resolution of National importance or amendment to the Constitution to be brought to a vote of the whole Association.

**SECTION 4.**
Before circulating such a petition by a Local Unit, the National President shall be notified in writing of such action and furnished with a copy or draft of the proposed question, resolution or amendment.
If such a petition is subscribed to by a majority of signatures of the members of twenty-five Local Units, *[from three different regions established under Article IV, Sections 1, 3], such total majority to represent ten percent (10%) of the overall membership of the National Association of Government Employees, the National President must submit such referendum of amendment to the Constitution to a referendum vote as hereinafter pre scribed; provided, however, that any Convention of this Association may, by motion, submit any resolution or amendment to the entire membership.

\* Note: This phrase inadvertently re-entered the document during the voting process. It inaccurately references Article IV, Sections 1,3, which was previously amended and voted upon.

37

**SECTION 5.**

Such petition shall be filed with the National President. A National Executive Vice President shall furnish ballots as provided in Section 3 hereof.

**SECTION 6.**

The proposition and a sample ballot shall be printed in the official organ at least one month before the mailing of the referendum ballots.

**SECTION 7.**

The National President shall appoint a Referendum Election Committee of ten (10) members, five (5) to be on one side of the proposition to be voted and five (5) on the other, no two (2) of whom shall be members of the same Local Unit, to canvas the vote and count the ballots at National Headquarters. The Referendum Election Committee shall separate the resumed ballots according to Local Units against the mailing list for Local Units by means of the return card, and shall then remove the sealed blank envelope containing the ballot and place it in its proper receptacle. After all such ballots from a Local Unit have been so placed in the receptacle they shall be opened and the ballots removed from the envelopes. The Referendum Election Committee shall then proceed to count the Ballots. Upon completion of the count the Referendum Election Committee shall certify the results of its count to the National President. It shall make a written report showing the number of ballots invalidated and the number of votes cast from each Local Unit for each side of the proposition submitted.

The results of the Referendum vote shall be published in the Association's official newspapers.

**SECTION 8.**

The National Executive Vice President shall mail to each member at his last known address appearing on the official records of the National Association one (1) ballot, one (1) blank envelope, and one (1) business reply envelope, bearing the return card of the member. The mailing list shall be the same as the mailing list used to distribute the issue of the Association's official newspapers containing the sample ballot. The ballots mailed to the members of any Local Unit shall not exceed the number on which per capita tax is currently paid. The member shall mark his ballot, place it in the return envelope which shall in turn be sealed and enclosed in the business reply envelope. A National Executive Vice President shall obtain a post office box to which all ballots shall be returned. The ballots may be withdrawn from the post office box only by two (2) or more members of the Referendum Election Committee. A letter of instructions only shall accompany the ballots mailed to the membership and no circular material, either pro or con, may be included with the ballot. The letter of instructions shall be prepared by the Referendum Election Committee and signed by two (2) or more of the said Committee but shall contain all of the Committee's members' names.

**SECTION 9.**

38

Arguments for or against a referendum shall be printed in the Association's official newspapers but not more than two thousand (2,000) words for a side. If more than one argument is submitted, the editor is required to publish that which is submitted by the Local initiating the proposition to be voted on.

**SECTION 10.**
It shall require a majority vote cast to decide all questions other than amendments to the Constitution which shall require two-thirds (2/3) affirmative vote to carry and decide.

**SECTION 11.**
No resolution or amendment adopted by a referendum vote of the national membership may be appealed or amended within one (1) year after election.

**SECTION 12.**
Except as otherwise expressly stated, any amendment to this Constitution and By-Laws shall become effective immediately upon adoption at the close of the Convention at which it was adopted.

**SECTION 13.**
The Constitution and By-Laws of this Local Union shall at all times be subordinate to the International Constitution and By-Laws, as it may be amended. Except where expressly waived in the Affiliation Agreement with the International Union, no amendment shall be valid or become effective until approved by the International Union.

# SEIU/NAGE MEMBERS BILL OF RIGHTS AND RESPONSIBILITIES ON THE JOB

The right to have work that is worthwhile to society, personally satisfying to the worker, and which provides a decent standard of living, a healthy and safe workplace, and the maximum possible employment security.

The right to have a meaningful and protected voice in the design and execution of one's work and in the long-term planning by one's employer as well as the training necessary to take part in such planning.

The right to fair and equitable treatment on the job.

The right to share fairly in the gains of the employer.

The right to participate fully in the work of the Union on the scope, content and structure of one's job.

The responsibility to participate in the Union's efforts to establish and uphold collective principles and values for effective workplace participation.

The responsibility to recognize and respect the interests of all Union members when making decisions about Union goals.

The responsibility to be informed about the industry in which one works and about the forces that will affect the condition of workers in the industry.

The responsibility to participate fully in the Union's efforts to expand the voice of workers on the job.

The responsibility to give fully and fairly of one's talents and efforts on the job and to recognize the legitimate goals of one's employer.

# SEIU/NAGE MEMBER BILL OF RIGHTS AND RESPONSIBILITIES IN THE UNION

The right to have opinions heard and respected, to be informed of Union activity, to be educated in Union values and Union skills.

The right to choose the leaders of the Union in a fair and democratic manner.

The right to a full accounting of Union dues and the proper stewardship over Union resources.

The right to participate in the Union's bargaining efforts and to approve Union contracts.

The right to have members' concerns resolved in a fair and expeditious manner.

The responsibility to help build a strong and more effective labor movement, to support the organizing of unorganized workers, to help build a political voice for working people, and to stand up for one's co-workers and all workers.

The responsibility to be informed about the internal governance of the Union and to participate in the conduct of the Union's affairs.

The responsibility to contribute to the support of the Union.

The responsibility to treat all workers and members fairly.

The responsibility to offer constructive criticism of the Union.

41

any of its affiliates.

**SECTION 5.** No officer or employee of NAGE shall convert or divert any funds or other property belonging to NAGE to such individual's personal use.

**SECTION 6.** No Union officer or managerial employee shall receive fees or salaries of any kind from a fund established for the provision of health, welfare, or retirement benefits, except for reasonable reimbursement of expenses provided uniformly to trustees of the fund.

**SECTION 7.** No person shall serve as an officer or managerial employee of NAGE who has been convicted of any felony involving the infliction of grievous bodily injury, been convicted of any crime of dishonesty or any felony involving misuse or abuse of such person's position or employment in a labor organization or an employee benefit fund, unless otherwise permitted under applicable law.

**SECTION 8.** The total compensation of any national officer of NAGE received from NAGE and/or any affiliated body shall not exceed the compensation paid to the International President of SEIU. In addition, the three (3) executive officers of NAGE shall be required to devote full time to the affairs of NAGE/SEIU and shall not accept any employment outside of NAGE/SEIU and shall not receive compensation for any outside employment, self-employment, or consulting positions of any type for services performed during the term of office.

This section shall not bar the three (3) executive officers from receiving a minimal stipend or appropriate expenses for teaching a course, serving on any boards, or other similar activity, as long as such endeavor is not inconsistent with the Union's interests and has been fully disclosed to and approved by the National Executive Committee.

**SECTION 9.** When any officer or managerial employee retires or terminates his or her service with NAGE, he or she shall be entitled to receive the cash value of properly documented unused leave time, including vacation time, up to two times (2x) the annual vacation or personal leave allotment, not to exceed twelve (12) weeks total.

**SECTION 10.** This Code is not intended to preclude officers or managerial employees of NAGE from owning publicly traded shares of any employer that engages in collective bargaining with NAGE or its affiliates through a mutual fund or other similar investment vehicle, provided that all transactions affecting such interests are consistent with rates and terms established by the open market.

43

Index

*A*

AATU.............................................................7
Absentee ballots ...........................................8
accountants ..........................................18, 19
age.............................................3, 4, 12, 28
agency fee payers .........................................16
**AMENDMENTS TO THE CONSTITUTION**
............................................................37
ancestry................................................12, 28
appeal .........................................10, 11, 33, 34
Appeals..............................................33, 34
associate members.......................................16
audit..................................19, 21, 23, 26
*Audit Sub-Committee*......................................23
Auditors...........................................18, 19, 21
Auditors Committee ....................................18

*B*

ballots ..........................................8, 9, 15, 34, 38
**BONDING OF OFFICERS AND**
    **EMPLOYEES**...........................................27
books and records.........................................18
*Budget Sub-Committee* ..................................23
business or financial interests..........................13

*C*

Charges Brought by or Action Taken by
    National President.....................................30
Chief Financial Officer...... 18, 19, 20, 21, 25, 26
Code of Ethical Practices.................. 14, 42, 43
**CODE OF ETHICAL PRACTICES**...........42
coerce ..........................................................13
color ................................................. 4, 12, 28
contracts...........................................4, 24, 35, 41
Convention...15, 16, 17, 18, 19, 20, 21, 22, 23,
    25, 33, 34, 36, 37, 39
Corrupt ........................................................28
credit unions................................................13
creed ....................................................12, 28

*D*

delegate................................................15, 20
delegates .................15, 16, 22, 25, 34, 36, 37

disbursements.................................................. 21
**DISCIPLINE OF LOCALS AND MEMBERS**
............................................................ 28
discrimination................................... 3, 4, 12, 28
Discrimination................................................ 28
Disloyalty..................................................... 28
Disobedience ................................................ 28
dissolution of the local unit ............................ 28
Division...................................................7, 8
dual unionism................................................ 28
dues.............. 9, 12, 13, 16, 17, 20, 25, 26, 28, 41
dues paying member ....................................... 12
*DUTIES AND POWERS* ..*See* National President
duty of fair representation .............................. 28

*E*

*Education/Communication Sub-Committee*..... 23
**ELIGIBILITY TO MEMBERSHIP**............ 12
emergency situation...................................30, 31
EMTs...............................................*See*  IAEP
ethnicity ........................................... 3, 4, 12, 28

*F*

fair hearing................................................... 29
false charges................................................. 28
Financial malpractice..................................19, 28
financial transactions ...................................... 21
force................................................. 13, 15, 33

*G*

gender ..............................................4, 12, 28
general membership meeting........................... 9
goals...........................................4, 19, 40
**GOVERNING BODY** ................................. 15
Grievance Committee ..........................8, 10, 11
Grievant ................................................10, 11

*H*

**HANDLING OF GRIEVANCES** ............... 10
headquarters ...........................................5, 38

*I*

IAEP ............................................................. 7
IBCO............................................................. 7

*vision* .............................................................. 3, 4
vouchers................................................... 18, 28

**w**

working members ...................................... 16, 17
wrongful taking ............................................ 28

# EXHIBIT 2

## BYLAWS OF LOCAL R3-77
## National Association of Government Employees

**Preamble**

We the members of Local R3-77, seek to further the interests of all Bargaining Unit employees of the Pension Benefit Guaranty Corporation (PBGC) by dealing constructively with PBGC management to ensure:

- A strong PBGC contributing vitality to the continuation of the nation's pension protection system;
- High quality products and services to our customers;
- A dedicated well-trained, and empowered workforce; and
- An atmosphere of mutual respect throughout the workplace.

We pledge ourselves to improve the general welfare of Government Employees, our members, their families, and their dependents whenever and wherever possible and to foster true collegiality among all members.

We recognize that management's authority to make certain decisions in the workplace should be balanced with employees' rights to be kept informed, to express differing views, and to have their views considered without retribution.

We further pledge ourselves to uphold and defend the Constitution and the Laws of the United States of America.

We affirm the Bylaws and Constitution of the National Association of Government Employees.

## Article I – Organization

Section 1, The Name of this Organization shall be the National Association of Government Employees, Local R3-77.

Section 2. The Local shall be organized and conducted within the framework of the Constitution and Bylaws of the National Association of Government Employees, affiliated with the Service Employees International Union (SEIU), AFL-CIO and any amendments thereof.

Section 3. The Local shall maintain its headquarters at the Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005. The Local shall hold scheduled general membership meetings there, or at the SEUI, 1313 L Street, N.W., Washington, D.C. 20005. The location of meetings may be changed with notice given to all current members, by a majority vote of the Executive Committee.

## Article II – Membership

Section 1. All bargaining unit employees, regardless of sex, race, color, creed, religion, age or national origin, employed by the Pension Benefit Guaranty Corporation, shall be eligible for membership in the National Association of Government Employees (NAGE), Local R3-77. Such an employee may become a member by completing an application and maintaining a good standing by payment of prescribed dues. Any Local officer may certify and approve the

application for membership. An eligible employee who pays dues by payroll withholding becomes a member on the first day of the pay period after he or she submits an 1187 dues withholding form to a Local officer or steward or person designated by the Executive Committee. A person is a member in good standing if they are currently employed by the Pension Benefit Guaranty Corporation as a bargaining unit employee and are current in the payment of prescribed dues and are otherwise in compliance with the national NAGE Constitution and Bylaws. A member may cancel dues withholding after one year by submitting a cancellation form to the PBGC at the proper time in accordance with relevant agreements between the Local and the PBGC.

Section 2. All members in good standing shall have equal rights and privileges within the Local to nominate candidates, to vote in elections or referendums, to attend meetings and to participate in the deliberations and voting upon the business of such meetings, subject to these Bylaws and the National Constitution and Bylaws. Every member shall have the right to meet and assemble freely with other members; and to express at meetings of the labor organization his or her views upon candidates in an election of the Local or upon any business properly before the meeting, subject to these Bylaws and the National Constitution and Bylaws.

Section 3. Any individual who has been expelled from membership in accordance with Article XI of these Bylaws may, not sooner than one year from such expulsion, re-apply for membership. A two-thirds majority of members present and voting when a quorum is present at the next regular meeting may approve such application.

Section 4. No person may become a member of more than one NAGE Local at any one time. Any member in good standing of Local R3-77 who has been assigned to the jurisdiction of another Local Unit may request a certificate from this Local stating their membership and the duration thereof. A member who retires may become a retired member and retain NAGE insurance and other benefits at reduced annual cost. To qualify for such reduced cost, the retiree must have been a member for at least five years. Retired members are ineligible to vote or hold office.

## Article III – Membership Meetings

General membership meetings normally will be held monthly. Notices will be posted on bulletin boards at least three days in advance, and, to the extent practicable, distributed to all members. Issues and procedures not covered by the NAGE Constitution and Bylaws and these Bylaws, will be governed by the current edition of Roberts' Rules of Order. Unless provided otherwise in these Bylaws, a quorum shall be no less than 30% of the membership in good standing. A quorum for the transaction of special business such as the ratification of agreements or memoranda of understanding or the adoption of bylaw amendments shall be no less than 51% of the affected membership in good standing. Prior to voting on any motion, matter or issue, the President, a majority of the members of the Executive Committee or a majority of the members present may determine that it is of such special importance that a 51% quorum is necessary.

The President, a majority of the members of the Executive Committee, a majority of the members present and voting at a meeting where there is a quorum, or 30% of the members by petition may have a motion that has been adopted at a membership meeting reconsidered at a

subsequent meeting.

The order of business will be (1) roll call of officers, (2) reading and approval of the minutes of the last meeting, (3) reports of officers and summaries of committee meetings, (4) unfinished business, and (5) new business.

All members in good standing of the Local may attend and participate in membership meetings. Guests may attend meetings at the invitation of the President or Executive Committee or by vote of the membership, except that members may vote to exclude any non-member.

Special meetings may be called by the President, or a majority of the Executive Committee. The President will convene a special membership meeting upon receipt of a petition signed by 30% of the members.

All questions coming before the Local shall be decided by a "yes" or "no" vote of the members present and voting. A standing count may be required if division is requested and seconded, or by a roll call if the Chair deems it necessary.

Any local member arising to address the Chair shall give his/her name before being recognized.

## Article IV – Executive Committee

Section 1. The Executive Committee is composed of the five elected officers and holds the overall governing authority of the Local between membership meetings. The Executive Committee will keep members informed and receive input and proposals from members. The Executive Committee will set and develop the Local's policy, goals and strategy in the area of labor-management relations with due consideration of and respect for the views of members. The Executive Committee will implement proposals adopted at membership meetings consistent with the NAGE Constitution and Bylaws and these Bylaws, and, otherwise, will exercise the full administrative authority to advance the best interests of the Local and its members.

Section 2. The Executive Committee will hold regular meetings at least monthly. To the extent practicable, regular Executive Committee meetings will be publicized and open to Local members. All Executive Committee members' voices and votes shall be of equal weight in deciding matters of policy or procedure. In case of tie votes, the side with which the chair votes shall prevail. The Executive Committee may hold closed, executive sessions and may close portions of sessions.

Section 3. The Executive Committee will decide all necessary expenditures over $40, except that all expenditures over $500 other than for arbitrations and legal fees will be submitted to the membership for approval.

Section.4. The Executive Committee will appoint the Chief Steward, all stewards, the members of all bargaining teams, the members who will be involved in representational activities, and the members of all joint labor-management committees. The Executive Committee will establish such committees as it deems appropriate to work on internal Local matters, and will appoint members after an open solicitation of the Local membership. The Executive Committee will also appoint members of internal committees established by mandate of the membership at membership meetings. The Executive Committee may remove appointees. Appointees shall

make no statements or representations concerning policies, practices, rules and procedures of the Local without the specific authorization of the Executive Committee.

Section 5. The Executive Committee has the authority to approve all agreements with management (subject to membership ratification where applicable), but may delegate such authority. Agreements subject to ratification by the membership must be approved by the Executive Committee, unless the Executive Committee decides instead only to make recommendations to the membership.

Section 6. The Executive Committee will decide on representation in Workers Compensation matters, retirement cases, and in proceedings involving the Merit Systems Protection Board, EEOC, OPM, Department of Labor and Federal Labor Relations Authority. The Executive Committee also will decide on the initiation and processing of unfair labor practice cases and lawsuits.

Section 7. Statements by Executive Committee members about Local policies, practices, rules and procedures will conform to and reflect the decisions of the Executive Committee and reflect the decisions voted on and approved by the membership at Local meetings.

Section 8. Special meetings of the Executive Committee will be convened on notice by the President or three officers. A quorum consists of three Executive Committee members.

Section 9. If a vacancy occurs in an elected office, the first next ranking Executive Committee member may at his or her option move up to fill the vacant position for the remainder of the term. If that officer declines to fill the vacant position, then the second next ranking officer may move up to fill the position. This process will be repeated until the vacancy is filled, or all remaining officers have declined to fill it. Where an officer chooses to move up in rank to fill a vacant position, his or her office will be declared vacant and the succession process describe above will apply to fill that office. After the Executive Committee members have completed the entire succession process, the remaining vacant position will be filled as follows. If more than six months remained in the term of the Executive Committee member whose office initially became vacant, then an election will be held to fill the remaining vacancy in accordance with Article VII. If six months or less remained, then the Executive Committee will notify the membership and receive their input, and the remaining officers will meet to fill the vacancy by a majority vote.

Section 10. Executive Committee as Local Grievance Committee
    The Executive Committee is the Local Grievance Committee as provided by Article XIV of the national NAGE Constitution and Bylaws. If not an officer, the Chief Steward may participate as a non-voting member of the Local Grievance Committee. With input from the stewards and members, as appropriate, the Local Grievance Committee is responsible for and has the authority to determine policy and strategy relating to issues involved in all grievances and to decide on proceeding with grievances through the Third Step. The Local Grievance Committee shall decide whether any grievance will proceed to arbitration.
    If the Local Grievance Committee (1) decides to reject or settle a grievance, (2) declines to process further a grievance, (3) decides to reject a grievance for arbitration, or (4) decides to

settle the arbitration matter or declines to process it further, then the grievant may appeal the
decision to the Local membership and to NAGE National in accordance with Article XIV of the
NAGE Constitution and Bylaws. The grievant may waive the right to appeal to the Local
membership, and appeal directly to NAGE. The Local Grievance Committee will timely notify
the grievant of these procedures.

In consultation with the Chief Steward and stewards, and with input from the membership,
The Executive Committee will develop procedures and guidelines for handling grievances with
due respect for the privacy of grievants and protecting and advancing the interests of the grievant
and the membership and bargaining unit as a whole.

## Article V – Officers

Section 1. The elected officers of the Local shall be:
> President
> Executive Vice President
> Secretary
> Treasurer
> Vice President At Large

Section 2. Except as provided otherwise, each officer shall be elected to a two years term of
office. Elections shall be held in August 2000. The officers elected then will assume office on
September 1, 2000, and serve terms for two years and seven months through March 31, 2003.
After the August 2000 election, an election will be held in March of 2003, and the officers
elected will assume office on April 1, 2003. Thereafter, elections will be held in March of every
odd numbered year, and officers will assume office on April 1.

Section 3. The five officers of the Local shall form the Executive Committee.

Section 4. A person cannot be nominated, elected or appointed to an office, or remain in office,
unless the individual is a member in good standing as defined in these Bylaws. An elected officer
shall not serve or remain in office if he or she is a PBGC EEO Counselor or a PBGC Ethics
Counselor.

## Article VI – Officers' Powers and Duties

President. Serves as the Local's chief executive officer; supervises the daily operation of the
Local; coordinates and oversees the activities of all committees; and convenes and presides at
meetings of the Executive Committee and Local. The President is the Local's representative in all
labor/management relations, and will monitor management's adherence to all agreements and
applicable laws and regulations. Serves as the Local's Chief Negotiator in all matters, unless she
or he delegates that duty in particular matters to another officer, or delegates such duty to a Local
member with the approval of the Executive Committee. Serves as primary contact with NAGE
national representatives and is the Local's spokesperson. Serves as an ex-officio, voting member
of all committees concerning internal union business. Signs all agreements with management,
subject to approval by the Executive Committee and ratification by the membership when

required. In emergencies, the President may confer with at least two other officers and reach a decision on behalf of the Executive Committee provided that at least two officers and the President agree to the decision. The President will promptly notify the Secretary in writing, and the other officers will provide written concurrence. Cosigns checks with the Treasurer. May, along with the Treasurer, approve necessary expenditures up to $40.

Executive Vice President. Assists the President at her or his direction. Presides and performs the daily duties of the office of the President in her or his absence and acts for the Local, including signatory authority where appropriate. Serves as a contact with NAGE.

Secretary. Is responsible for all Local records and correspondence and maintains files. Assists the President in the preparation of brochures, pamphlets, articles, bulletins, notices and publicity. Records minutes of all meetings of the Executive Committee and the Local and reads them at meetings. Oversees the distribution of literature to members and the maintenance of bulletin boards. Submits updated membership records to the NAGE office. Is the third highest ranking Local officer, and acts for the Local in the absence of the President and Executive Vice President including with signatory authority where appropriate.

Treasurer. With the approval of the Executive Committee, establishes and maintains an account with a bank for the receipt of Local dues and other income and for making expenditures. Keeps a current record of all receipts and expenditures in accordance with accepted accounting practices. Makes financial reports at regular Executive Committee and membership meetings. Arranges for the bonding of all officers in the amount of at least $5,000 each. Dispenses money only upon written authorization of the President for amounts up to $40, or following approval of the Executive Committee for greater amounts. Prepares and submits financial reports required by the Department of Labor, the IRS and NAGE. Is the fourth highest ranking Local officer, and acts for the Local in the absence of the President, Executive Vice President and Secretary including with signatory authority where appropriate.

Vice President at Large. Assists the President at her or his direction and serves the Executive Committee. Is the fifth highest ranking Local officer, and acts for the Local in the absence of the President, Executive Vice President, Secretary and Treasurer including with signatory authority where appropriate.

Duty to Maintain and Turn Over Records. Each officer who has access to or custody over records of the Local will maintain them with due care. Upon vacating an office or at the end of a term, an officer will turn over records to the President and Executive Committee or the respective successors. Where records to be turned over contain confidential information or privacy information pertaining to individuals, the records will be sanitized to remove identifying information unless the affected individual in writing authorizes the records to be turned over with the identifying information.

**Article VII – Elections**

Section 1. Elections shall be held in August 2000, in March 2003 and thereafter in March of odd

numbered years at a general meeting by secret ballot. Members shall have no less than fifteen (15) days notice of the date, time and place of the elections. An Election Committee shall be established by the Executive Committee consisting of three members from the general membership of the Local. No member who is a candidate for the office(s) being filled may serve on the Election Committee. After the Election Committee certifies the results, newly elected officers will take over from incumbents on September 1, 2000, April 1, 2003, and thereafter on April 1 of odd numbered years.

Section 2. Members shall be notified at least two weeks, but not more than four weeks, prior to the close of nominations that nominations for the election are being solicited. Notification shall be made by public notice and by direct mail to members' last known home address.

Section 3. Nominations shall be made at a general meeting of the membership or by signed nominating ballot, or both, as determined by the Election Committee. Nominees, who must be a member in good standing for at least 180 days, shall be present at the nomination meeting, or shall accept the nomination in writing submitted to the Election Committee by the close of the nominating meeting. Nominating ballots shall bear the signatures of the nominator, and the seconding member, as well as the typed or printed names, and the office the nominee is running for. Completed nominating ballots will be returned to the Election Committee. A member may run for only one office at a time.

Section 4. The Election Committee shall have the following responsibilities:
   a. Prepare lists of eligible voters
   b. Review nominations of candidates for office to determine eligibility
   c. Prepare ballots
   d. Process absentee ballots
   e. Obtain ballot box and supervise polls on day of election
   f. Count ballots and determine results
   g. Announce results
   h. Secure ballots and prepare a report of the election
If there is only one candidate who has accepted a nomination for a particular office, that candidate is unopposed and an election will not be held for that office. The unopposed candidate will assume office September 1, 2000, and thereafter on April 1 of an election year.

Section 5. Distribution of Campaign Literature
   The Election Committee will honor any reasonable request by a candidate to distribute campaign literature by mail to members at the candidate's expense. Requests will be honored in the order received. Campaign literature must be provided to the Election Committee in sealed, stamped envelopes that are ready for mailing to members. Each candidate should check with postal officials to determine the proper postage. The Election Committee will affix mailing lables to each stamped envelope and mail them. Candidates must pay $15 to cover the cost of address labels.
   Each candidate, upon request, will receive a current list of members, provided the candidate agrees not to let the list be used for commercial purposes.

Section 6. Campaign Restrictions

Federal law prohibits the use of any union or employer funds to promote the candidacy of any person in a union officer election. This prohibition applies to cash, facilities, equipment, photocopy machines, vehicles, office supplies, letterhead, etc. of NAGE, NAGE Local R3-77, any other union, the PBGC, or any employer whether or not they employ NAGE Local R3-77 members. Union members may not campaign on their work time. Union representatives may not campaign on official time except insofar as it is incidental to their duties. The NAGE Local R3-77 office may not be used for campaign activity.

Section 7. Voter Eligibility

Any PBGC bargaining unit employee who is eligible to be a member of NAGE in accordance with Article VI of the NAGE Constitution and Bylaws is a member in good standing of NAGE Local R3-77 and is eligible to vote provided that the employee submitted a properly completed Form 1187 dues withholding form or remitted annual cash dues to the Local R3-77 by the close of the nominations meeting.

Section 8. Ballots and Slates

Candidates for each office will be listed on the ballot in alphabetical order by last name. For offices where there is a single, unopposed candidate, the candidate will be listed on the ballot with a notation "Unopposed—Will Take Office." No write-in votes shall be counted.

Each candidate who wishes to be identified as a member of a slate will have the name of the slate listed with his or her name. For example: JANE DOE (Blue Slate). Members of the same slate must submit a letter or designation to the Election Committee signed by each member of the slate.

Section 9. Absentee Voting

Members who believe that they will not be able to be present to vote in person on the election date may vote by absentee ballot in accordance with rules established by the Election Committee.

**Article VIII – Stewards**

Section 1. Chief Steward: Appointed by the Executive Committee, the Chief Steward coordinates the efforts of all Stewards. Oversees the performance of the Stewards, keeps track of the status of all grievances and deadlines. And ensures privacy and confidentiality. Keeps the President current on and abreast of all grievances. Notifies the President and Executive Committee as much in advance as possible of grievances heading for Step Two, Step Three or Arbitration. Promptly reports to the President the concerns of employees, potential grievances and possible violations by management. Recommends to the Executive Committee how members and the Local may actively support grievances.

The Chief Steward chairs the Stewards Committee and recommends to the Executive Committee training programs for stewards and the appointment or removal of stewards. Confers with NAGE national representatives about grievance issues and reports the NAGE advice to the President and Executive Committee.

Section 2. Stewards. Stewards shall (1) recruit new members and keep members and other

employees updated on union activities, (2) advise employees regarding their rights, (3) represent employees and the Local in meetings when they involve discussions of personnel policies or practices, performance standards or working conditions, (4) represent employees in investigations by the employer, (5) represent employees in First Step Grievances. Stewards will maintain contact with members and employees in their area to ascertain research and investigate their concerns and interests. Stewards will promptly report unsatisfactory workplace conditions to the Chief Steward or to an officer. In consultation with the Chief Steward, and with the approval of the Local Grievance Committee, stewards will represent employees in Second and Third Step grievances. Stewards will maintain privacy and confidentiality. Stewards shall ensure that all terms of agreements with management are complied with by supervisors in their areas, and shall report any possible violations to the Chief Steward or the Executive Committee.

## Article IX – Revenues and Dues

Section 1. Annual dues shall be designated by the Headquarters, National Association of Government Employees and shall be submitted to the National Office, 159 Burgin Parkway, Quincy, Massachusetts 02169. The Local will receive its share of the dues from the National Treasurer. Members will be encouraged to sign dues allotment agreements for deduction of dues. Members may, however, pay annual dues in a lump sum at the beginning of each one year period of membership.

Section 2. No Local rate of dues, initiation fee or general or special assessment shall be levied or increased except (A) by a majority vote by secret ballot of the members in good standing voting at a general or special membership, after reasonable notice of the intention to vote upon such question, or (B) by a majority vote of the members in good standing voting in a membership referendum conducted by secret ballot.

Section 3. The Executive Committee shall be the governing authority on matters of delinquent membership and renewal of past members. Any member adjudged delinquent shall have the right of appeal, in writing, to the Local's Executive Committee whose decision shall be honored.

Section 4. Any person in arrears for more than three months' dues shall not be recognized as being a member in good standing by the Local. The Treasurer shall notify, in writing by certified mail, any members not in good standing.

Section 5. The Executive Committee may, from time to time, authorize the Local to undertake fund-raising activities either for specific purposes or for the general use of the Local. All revenues of the Local, from whatever source, shall be accounted for and reported by the treasurer.

## Article X – Amendments

Section 1. All proposed amendments to these Bylaws shall be submitted by any member in good standing in writing at a regular general meeting of the Local. Such proposed amendments must be signed by twenty members in good standing of the Local. Proposed amendments may also be presented to the general membership by the Executive Committee. The proposed amendment

shall be read by the Secretary under the heading of new business, at the meeting when submitted. The proposed amendment shall be mailed to all members in good standing no later than two (2) weeks prior to the next scheduled meeting.

Section 2. After such a notice, the proposed amendment shall become a part of the Bylaws, if at the next regular general meeting where a 51% quorum is present it is approved by a two-thirds majority of the members present and voting.

## Article XI – Discipline

Section 1. A Local officer (elected or appointed), who misses four (4) consecutive regular Executive Committee meetings or four (4) consecutive regular general membership meetings, without just cause, shall have his/her office declared vacant, and shall be so notified by the Executive Committee in writing. The Executive Committee shall make determinations as to whether just cause exists for absences. The decision of the Executive Committee to declare an office vacant may be appealed by the incumbent at the next general membership meeting. A vote of two-thirds of the members voting where there is a 51% quorum at a membership meeting shall overturn the action of the Executive Committee.

Section 2. If at any time a member wishes to resign from the Local, he/she shall give notice of intention in writing to the Secretary, who shall present the resignation to the Executive Committee at its next meeting. No refund of dues shall be allowed.

Section 3. Other than for nonpayment of dues, no member of the Local may be disciplined by the Local, except in accordance with Article V, Section 2 of the NAGE National Constitution and Bylaws. As provided in the NAGE National Constitution and Bylaws, The Executive Committee is the trial committee, and has the authority to impose appropriate penalties. A member or officer disciplined or a member whose charge has been dismissed may appeal to a special meeting of the members or waive that right and appeal in accordance with Article V, Section 4 of the NAGE Constitution and Bylaws. If a quorum is present at such Local meeting, a majority of those present and voting may decide the appeal. After such a Local meeting, a disciplined member or officer or a member whose charge has been dismissed may appeal to a special meeting of the members or waive that right and appeal in accordance with Article V, Section 4 of the NAGE Constitution and Bylaws.

## Article XII – Expenditures & Appropriations

Section 1. Members of the Executive Committee may expend funds necessary and appropriate for the operation of the Local in amounts up to $40 subject to the approval of the President and Treasurer. Such funds may be obtained in advance from the treasurer, or the officer may be reimbursed. The officer expending funds is responsible for obtaining receipts when possible, or certifying the amount if a receipt is not available, and providing such documentation to the Treasurer. The Treasurer may maintain a petty cash fund of $40 for that purpose. All expenditures or appropriations over $40 must be reviewed and approved by the Executive Committee. Payment for all amounts in excess of $40 shall be made by check and co-signed by

the Treasurer and the President.

Section 2. There shall be no disposal of property of the Local without a majority vote of the members present and voting at a regular meeting.

Section 3. All proposed expenditures or appropriations over $500 other than for arbitrations or legal expenses must be submitted to a vote of the general membership at a regular or special meeting. A majority vote of those present and voting shall be required to approve such expenditures.

## Article XIII – Ratification of Agreements

The Executive Committee will ensure that agreements with management that substantially affect the membership generally, including the adoption of or amendments to the Collective Bargaining Agreement, will be subject to a ratification vote at a membership meeting. Notice of a meeting for ratification of a collective bargaining agreement will be 15 days in advance.

Where an agreement with management substantially affects only a particular department, division, or group of employees, the Executive Committee will ensure that the agreement is subject to ratification by the affected Local members.

If a 51% quorum of the affected membership is not present at a Local meeting, then a ratification vote may be taken by (1) a roll call vote at a series of meetings, (2) referendum, (3) petition, (4) in-person balloting over a period of time, or (5) mail ballot or referendum or by any combination of these methods. The method(s) may be decided by the Executive Committee or by a vote of the membership at a meeting where there is a 30% quorum of the membership. Ratification shall be by a majority of those voting where a 51% quorum is present at a meeting or by a majority of those voting by the chosen methods provided at least 51% of the affected members vote by those methods.

Adopted: June 29, 2000

# EXHIBIT 3

## Baird Rhonda

| | |
|---|---|
| **From:** | Baird Rhonda |
| **Sent:** | Monday, November 21, 2005 5:16 PM |
| **To:** | Petta Richard; Jeffers Dwayne; Perry Robert; 'shapiro@swickandshapiro.com'; 'dholway@nage.org'; 'rbarry@nage.org'; Bernsen Stuart; 'nage@erols.com'; 'spooler@nage.org' |
| **Cc:** | Montgomery Delarse; Greenhill Barry |
| **Subject:** | Misuse of Union Records From the Rhonda Baird Arbitration |
| **Importance:** | High |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Petta Richard | |
| | Jeffers Dwayne | |
| | Perry Robert | Read: 11/22/2005 9:34 AM |
| | 'shapiro@swickandshapiro.com' | |
| | 'dholway@nage.org' | |
| | 'rbarry@nage.org' | |
| | Bernsen Stuart | Read: 11/21/2005 5:19 PM |
| | 'nage@erols.com' | |
| | 'spooler@nage.org' | |
| | Montgomery Delarse | |
| | Greenhill Barry | Read: 11/22/2005 8:09 AM |

It is with shock and surprise that I learned today that Mr. Jeffers produced a great portion (if not all) of the evidentiary record from my arbitration to Robert Perry's private attorney, David Shapiro. Mr. Jeffers obtained all of the information in the evidentiary record in his capacity as a union official, as the arbitrator noted today when he learned about this action. He was aware of the existence of a protective order involving much of what he admitted producing. Mr. Jeffers, therefore, knowingly violated the confidentiality and privacy that should have been accorded the documents. In fact, much of the information he produced exceeded the scope of the subpoena and is clearly not responsive (thus begging the question of why it was produced in the first place). Additionally, the union, both Local and National, has received several expressions of concern about Mr. Jeffers' conduct vis-à-vis his responsibilities as a union official. These concerns included requests to return these very records to me to stem any likelihood of just this type of abuse.

This message is sent to each of you in your official capacities to inform you of the fact that this violation has in fact occurred and to request your assistance to stem the damage done by the misconduct of this union official. Please know that Mr. Jeffers has been ordered to retrieve any and all medical and disciplinary information that has been produced and to ensure it is destroyed or turned over to the arbitrator. Mr. Perry is ordered to do the same. In fact, I expressly ask anyone who received any information from the Rhonda Baird arbitration records to please defer from using it or copying it or in anyway disseminating the information to allow me time to determine how best to address this matter.

I welcome the comments or suggestions of each of you on how this matter should be handled. It would be most constructive if we can resolve this consensually. It must be noted that in my opinion, Mr. Jeffers should be disciplined for his intentional misconduct. It seems

readily apparent that Mr. Jeffers hoped to put the information in Mr. Perry's hands so they both could use it for their own cases and actions against the agency and other bargaining unit members. This type of behavior should not be countenanced by the Local, National, or anyone else involved in this situation. I ask each of you to contact me to discuss this issue at your earliest convenience.

Thank you for your time and attention to this very serious matter.

**Baird Rhonda**

| | |
|---|---|
| **From:** | David Holway [dholway@nage.org] |
| **To:** | Baird Rhonda |
| **Sent:** | Tuesday, November 22, 2005 9:56 AM |
| **Subject:** | Read: Misuse of Union Records From the Rhonda Baird Arbitration |

Your message

| | |
|---|---|
| To: | Petta Richard; Jeffers Dwayne; Perry Robert; shapiro@swickandshapiro.com; dholway@nage.org; rbarry@nage.org; Bernsen Stuart; nage@erols.com; spooler@nage.org |
| Cc: | Montgomery Delarse; Greenhill Barry |
| Subject: | Misuse of Union Records From the Rhonda Baird Arbitration |
| Sent: | 11/21/2005 5:16 PM |

was read on 11/22/2005 9:56 AM.

1

# EXHIBIT 4

## Baird Rhonda

| | |
|---|---|
| **From:** | RNBaird64@aol.com |
| **Sent:** | Tuesday, November 22, 2005 12:46 PM |
| **To:** | rbarry@nage.org; dholway@nage.org |
| **Subject:** | Formal Complaint re Misappropriation of Records from the Rhonda Baird Arbitratio |

This e-mail serves as a formal complaint about the misconduct committed by NAGE Local R3-77 communicated to you by e-mail dated November 21, 2005. I am expressly requesting an investigation into the matter. The Local has horribly abused its authority and committed misfeasance, malfeasance and nonfeasance through the conduct of its officers.

Not only are my privacy rights violated, but so are those of other bargaining unit members. You may be aware that the Local's Bylaws provides that officers have the following responsibilities:

Duty to Maintain and Turn Over Records. Each officer who has access to or custody over records of the Local will maintain them with due care. Upon vacating an office or at the end of a term, an officer will turn over records to the President and Executive Committee or the respective successors. Where records to be turned over contain confidential or privacy information pertaining to individuals, the records will be sanitized to remove identifying information unless the affected individual in writing authorizes the records to be turned over with the identifying information.

Additionally, Article VII, Section 1 provides that "the Chief Steward coordinates the efforts of all the Stewards. Oversees the performance of the Stewards, keeps track of the status of all grievances and deadlines, and ensures privacy and confidentiality."

It is clear from the information shared with you yesterday that these Bylaws were violated and that the conduct is also a violation of the National Union's Bylaws and Constitution.

Please contact me at your earliest convenience to discuss this matter. I am going to file formal charges if I don't hear from you within a week. Thank you for your attention to this complaint.

Rhonda Baird
Dues Paying Member NAGE Local R3-77

# EXHIBIT 5



UNITED STATES OF AMERICA
### FEDERAL LABOR RELATIONS AUTHORITY
**SAN FRANCISCO REGION**
901 Market Street, Suite 220
San Francisco, California 94103-1791
(415) 356-5000 Fax:(415) 356-5017

September 28, 2007

Rhonda Baird
13615 Layhill Road
Silver Spring, MD  20906

Re:   National Association of Government
        Employees, SEIU
      Case No. WA-CO-06-0467
              -and-
      National Association of Government Employees,
        Local R3-77, SEIU
      Case No. WA-CO-06-0468

Dear Ms. Baird:

The unfair labor practice charges in these cases were filed with the Washington Regional Office on May 18, 2006 and were transferred to the San Francisco Regional Office on May 9, 2007. After investigation, consideration of the evidence, and application of the law to the facts, issuance of a complaint is not warranted.

As clarified in the investigation, the charge in Case No. WA-CO-06-0467 alleges that the National Association of Government Employees, SEIU, AFL-CIO (NAGE National) violated section 7116(b)(1)(2)(3) and (4) of the Federal Service Labor-Management Relations Statute (Statute) by acts in derogation of the duty of fair representation, by failing to fulfill obligations under the union's constitution and bylaws, and by discriminating against Charging Party.

The charge in Case No. WA-CO-06-0468, as clarified, alleges that the National Association of Government Employees, Local R3-77, SEIU, AFL-CIO (Local Union) violated section 7116(b)(1)(2)(3) and (4) of the Statute by violating orders of an Arbitrator and District Court, failing to investigate alleged misconduct of certain union representatives, interfering with the Charging Party's right to arbitrate a grievance, attempting to cause Charging Party's employer to discriminate against her; and discriminating against Charging Party with respect to union membership by refusing to fund her arbitration, process her complaints and/or provide her with proper representation.  The FLRA has jurisdiction over the matters raised in these charges.

Charging Party works as an attorney for the Pension Benefit Guarantee Corporation (PBGC).  At the time of the events involved in these cases, the Local Union held exclusive recognition for a unit of PBGC employees.  Charging Party was included in the unit of exclusive recognition and was a member of the Local Union at all times relevant to the events involved in these cases.

By way of background, Charging Party filed a grievance with the Local Union's assistance in late 2002.  The grievance was not resolved and, on February 20, 2003, the Local Union invoked arbitration.  In accordance with existing policy, NAGE National then determined whether or not to proceed to arbitration.  On January 12, 2004, the NAGE National President issued a final

1

decision to deny both representation and financial support for the arbitration of Charging Party's grievance.

The Local Union then notified Charging Party that although neither NAGE National nor the Local Union would represent her in arbitration, she could proceed at her own expense if she wished. Charging Party elected to proceed. On February 24, 2004, the Local Union agreed to Charging Party's request that her representative for the arbitration proceeding be authorized to receive official time for that purpose. The Charging Party had designated as her representative a unit employee who was also a Local Union Representative.

The arbitrator initially made a determination that the case could proceed on the merits. He then conducted 13 days of hearing. On April 20, 2005, the arbitrator issued a 90 page decision on the merits of the grievance. The arbitrator retained certain remedy issues for future proceedings. Thus, at the time of the events involved in these cases, the arbitration of the grievance had not been completed.

As a preliminary matter, to the extent that the allegations raised are based on conduct and actions that occurred prior to November 17, 2005, they are untimely raised in these charges and must be dismissed. In this regard, section 7118(a)(4)(A) of the Statute requires that any charge must be filed within six months of the alleged unfair labor practice. *U.S. Dep't of Labor*, 20 FLRA 296, 297 (1985) (*DOL*). Thus, a charge must be "based on events occurring within the six-month period preceding the original charge[.]" *U.S. Penitentiary, Florence, Colo.*, 53 FLRA 1393, 1402 (1998).

Section 7118(a)(4)(B) provides an exception to this six month rule, where the charging party does not learn of the alleged unfair labor practice immediately, either due to a respondent's failure to perform a duty owed to the charging party, or because of concealment of the alleged unfair labor practice. *Dep't of the Treasury, U.S. Customs Serv., El Paso, Tex.*, 55 FLRA 43, 46 (1998); *U.S. Dep't of the Air Force, Williams Air Force Base, Chandler, Ariz.*, 38 FLRA 549, 560-61 (1990) (failure of agency to provide union with notice of change in working conditions warranted suspension of six month filing deadline for unfair labor practice charge). *See also, Veterans Admin. and Veterans Admin. Med. Ctr., Lyons, N.J.*, 24 FLRA 255 (1986)(breach of duty alone, is not enough to warrant exception; the failure to perform a duty must have prevented the discovery of the unfair labor practice within six months of its occurrence).

In these cases, there is no contention that NAGE National or the Local Union concealed alleged unfair labor practice conduct from the Charging Party. In addition, that the Charging Party was prevented from raising her allegations within six months based on failure by NAGE National or the Local Union to perform a duty owed her. In these circumstances, it is concluded that all allegations raised in these charges that are based on conduct that occurred on or before November 17, 2005 are untimely filed. *DOL*.

Further, no evidence was presented in either case to support a finding that NAGE National or the Local Union discriminated against the Charging Party in terms and conditions of membership in the labor organization.

With respect to Case No. WA-CO-06-0467, the Charging Party contends that in its treatment of her, NAGE National failed to comply with federal labor and civil rights laws. To the extent that these contentions involve alleged breaches of the standards of conduct for labor organizations set out in section 7120(a) through 7120(d) of the Statute, the issues must be raised with the Assistant

2

Secretary of Labor. Such allegations do not involve unfair labor practice conduct. Similarly, issues related to rights and obligations under civil rights laws, must be raised through the statutory or administrative procedures established for addressing such matters. These allegations also do not involve unfair labor practice conduct.

Charging Party also alleges that NAGE National failed to comply with its constitution and bylaws, to investigate her complaints against the Local Union, and to take action against either the Local Union or a Local Union Representative. To the extent any of these allegations are timely raised in Case No. WA-CO-06-0467, the issues involve matters internal to the union and must be raised through whatever internal process NAGE has established for addressing such matters and/or through a complaint to the Assistant Secretary of Labor. *See, Am. Fed. of Gov't. Employees*, 8 FLRA 718 (1982)(*AFGE*). These allegations do not involve unfair labor practice conduct.

In addition, the charge alleges that NAGE National's treatment of the Charging Party was an attempt to retaliate and discriminate against her for giving declarations in legal actions and for filing and pursuing unfair labor practice charges against both NAGE National and the Local Union. To the extent this allegation is timely raised, the investigation revealed that Charging Party provided declarations on behalf of plaintiffs in a lawsuit challenging NAGE National's imposition of a trusteeship on the Local Union. In addition, Charging Party filed unfair labor practice charges against NAGE National and the Local Union. She provided evidence in the investigations of the charges she filed. evidence that she had for testifying in court

While the Charging Party supported the lawsuit and filed charges against the union, the evidence fails to establish that NAGE National failed to comply with its constitution and bylaws, to investigate her complaints or to take action against the Local Union because she had done so. Further, there is no evidence to suggest that NAGE National engaged in violations of federal labor or civil rights laws because of Charging Party's support of the lawsuit and pursuit of unfair labor practice charges.

No evidence was presented of any attempt by NAGE National to cause or attempt to cause PBGC to discriminate against Charging Party or to coerce, discipline, fine or attempt to coerce Charging Party as punishment, reprisal or for the purpose of hindering or impeding her work performance, productivity or discharge of duties. Thus, there is no evidence in this case that of a violation of section 7116(b)(1)(2) and/or (3) of the Statute.

In Case No. WA-CO-06-0468, the Charging Party contends that the Local Union violated the Statute when a Union Representative released information concerning her in response to a subpoena in a U.S. District Court action. In this regard, the Charging Party alleges that the Local Union's conduct violated both an Arbitrator's order and a court order. To the extent these allegations are timely raised, it is concluded that no violation of the Statute occurred. First, an alleged failure to comply with a court order must be addressed through the court and does not involve unfair labor practice conduct.

As to the alleged violation of the Arbitrator's order, the investigation revealed that the Charging Party's grievance was subject to a bifurcated arbitration process. At the time the alleged release of information occurred, no final arbitration decision had been issued because the remedy portion of the case had not been heard. Therefore, there was no final and binding arbitration award. However, Charging Party contends that the Arbitrator made statements about release of information related to the arbitration and that the Local Union acted contrary to these instructions by providing such information in connection with the court proceeding.

3

It is an unfair labor practice to refuse to comply with a final and binding arbitration award. *See,* e.g., *Dep't. of the Treasury, U.S. Customs Svce., New York Region, New York, N.Y.,* 21 FLRA 119 (1986). In this case, there was no arbitration award that addressed the issue of the release of information and documents in connection with the Charging Party's case. Therefore, at the time the alleged improper release of information in the court proceeding occurred, there was no final and binding award. Thus, to the extent the Local Union released improperly released information related to the arbitration, this conduct did not violate the Statute.

The charge also alleges that the Union Representative made statements in a PBGC investigation in April 2006 that improperly released and falsely portrayed Charging Party's private medical information. In this regard, Charging Party asserts that the Union Representative informed her that he had been directed by agency management to release her medical diagnosis in an agency investigation into claims he had made against her. Charging Party contends that the release of this information was improper and constituted an attempt to cause the agency to discriminate against her. She notes that her appraisal has been lowered since the time that the Union Representative made these remarks to agency representatives.

Section 7114(a)(1) of the Statute imposes on federal sector unions a duty to fairly represent employees. In accordance with section 7114(a)(1), where a union is acting as the exclusive representative of its unit members, the activities of the union must be undertaken without discrimination and without regard to union membership. *See, Fort Bragg Ass'n of Educators, Nat'l Educ. Ass'n, Fort Bragg, N.C.,* 28 FLRA 908, 918 (1987) (*Fort Bragg*).

In addition, where union membership is not an issue, the test is whether the union deliberately and unjustifiably treated one or more bargaining unit employees differently from other employees in the unit. The union's actions must amount to more than mere negligence or ineptitude; the union must have acted arbitrarily or in bad faith, and the action must have resulted in disparate or discriminatory treatment of a bargaining unit employee. *Nat'l Fed'n of Fed. Employees, Local 1453,* 23 FLRA 686 (1986) (*NFFE*). A failure of the duty of fair representation is a violation of section 7116(b)(1) and (8) of the Statute and this charge has been considered as if it had alleged violations of section 7116(b)(1) and (8) of the Statute.

There is no evidence in this case that the Local Union directly sought to influence agency management to take an action against the Charging Party or to otherwise discriminate against her in violation of section 7116(b)(1) and (2) of the Statute. Rather, this allegation raises issues of whether the Local Union failed in its duty to fairly represent the Charging Party.

As regards the conduct of the Union Representative in the 2006 investigation, the evidence does not establish that a violation of the Statute occurred. Without regard to whether or not the Union Representative properly or improperly released information regarding Charging Party, this alone is insufficient to demonstrate a breach of the duty of fair representation. *Ft. Bragg; NFFE.*

With respect to the allegation that the Local Union failed to address her complaint about the alleged misconduct of certain union representatives, like the similar allegations against NAGE National, this allegation involves matters internal to the union and must be raised through whatever process NAGE has established for addressing such matters and/or through a complaint to the Assistant Secretary of Labor. *AFGE.* The allegation does not involve unfair labor practice conduct.

4

The charge also alleges that the Local Union discriminated against Charging Party with respect to her membership in the labor organization by failing to address her complaints about internal union matters and by failing to provide proper representation and financial support in her arbitration. To the extent these allegations are timely raised, the investigation revealed that the Charging Party has continued to attempt to secure union financial assistance in covering thousands of dollars of arbitration expenses.

Following the determination in January 2004 that the union would not provide representation or financial assistance in arbitration, neither NAGE National nor the Local Union has ever reversed this decision. No evidence was presented to suggest that the failure to change position on providing representation and/or funding the arbitration was discriminatory or that other unit employees were treated differently in similar circumstances. Thus, there is insufficient evidence to establish that the Local Union's conduct violated section 7116(b)(1) and (4) of the Statute.

Finally, the charge alleges that the Local Union's conduct amounted to interference, restraint or coercion with respect to the exercise of protected rights, including her right to proceed to arbitration. The evidence fails to establish that any of the conduct discussed above violated Charging Party's rights under the Statute. Further, there is no evidence of any independent interference with statutory rights in this matter or any statement made by any Local Union representative that interfered with protected rights. In particular, there is no evidence that the Local Union interfered with Charging Party's right to arbitrate her grievance.

The Charging Party has no independent right to arbitrate a grievance, only the parties to exclusive recognition have this right. In this case, the Local Union refused to arbitrate the grievance in 2004, but permitted Charging Party to proceed to arbitration without union representation and at her own expense. The statements and conduct of Local Union representatives between November 17 and May 18, 2006 do not change the union's 2004 denial of representation and refusal to pay for the arbitration. Therefore, the evidence fails to establish that the Local Union denied the Charging Party any right to arbitration as alleged in the charge.

Based on the foregoing, there is no basis for finding a violation of the Statute in either of these charges. Therefore, the charges are dismissed. An appeal may be filed by mail or hand delivery with the Office of the General Counsel at the following address:

> Federal Labor Relations Authority
> Office of the General Counsel
> 1400 K Street N.W., 2nd Floor
> Attention: Appeals
> Washington, D.C. 20424-0001

Whichever method is chosen, please note that the last day for filing an appeal of the dismissal (Case Nos. WA-CO-06-0467 and WA-CO-06-0468) is **October 29, 2007**. This means that an appeal that is mailed must be postmarked, or an appeal must be hand delivered, no later than , **October 29, 2007**. Please send a copy of your appeal to the Regional Director.

If more time is needed to prepare an appeal, a motion to request an extension of time may be filed. Mail or hand deliver the request for an extension of time to the Office of the General Counsel at the address listed above. Because requests for an extension of time must be **received** at least five days before the date the appeal is due, any request for an extension of time in this case must be **received** at the above address no later than **October 24, 2007**.

5

The procedures, time limits and grounds for filing an appeal are set forth in the Authority's Regulations, contained in Volume 5 of the Code of Federal Regulations at section 2423.11. The regulations may be found at any Authority Regional Office, public law library, some large general purpose libraries, Federal Personnel Offices and the Authority's Internet site: **www.flra.gov.** I have also enclosed a document that summarizes commonly-asked questions and answers regarding the Office of the General Counsel's unfair labor practice appeals process.

Sincerely,

*Gerald M. Cole*

Gerald M. Cole
Regional Director

Enclosures:     Certificate of Service
                Questions and Answers About Appeals

cc:     Gina Lightfoot Walker, Deputy General Counsel, National Association of Government Employees, SEIU, 601 North Fairfax Street, Suite, 125, Alexandria, VA 22314

        Colleen Duffy Kiko, General Counsel, Office of the General Counsel, Federal Labor Relations Authority, 1400 K Street NW, Second Floor, Washington, D.C. 20424-0001

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Valda T. Johnson, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) Case No. 1: 03CV02513 (ESH) |
| | ) |
| v. | ) |
| | ) |
| David Holway, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## MEMORANDUM OF DEFENDANTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT

### Introduction

Plaintiffs' complaint, which was filed December 9, 2003, challenged the actions of the National Association of Government Employees ("NAGE"), a national labor organization, and David Holway, acting in his official capacity as National President of NAGE, in placing one of its local affiliates, R3-77, into trusteeship on an emergency basis. Plaintiffs alleged that Defendants' actions violated the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411 et seq. More specifically, the complaint alleged that the trusteeship was imposed contrary to the procedures outlined in the NAGE constitution (Count 1); that the trusteeship was imposed in bad faith and for an improper purpose (Count 2); and that removing the Plaintiffs as officers of Local R3-77 violated their rights as members under 29 U.S.C. § 529 (Count 3).

In addition to filing their complaint, Plaintiffs moved for a temporary restraining order seeking to enjoin the imposition of the trusteeship and the removal of Plaintiffs as officers. At a December 16, 2003 hearing, this Court issued an oral ruling denying

Plaintiffs' motion on the ground that Plaintiffs had failed to meet their burden to show

that the imposition of the trusteeship was in contravention of NAGE's constitution, or

done in bad faith or for improper purposes.[1]  Hearings on the trusteeship began January

16, 2004 and concluded July 1, 2004.  On August 24, 2004, the Hearing Examiner issued

his decision, which concluded that 'the trusteeship was properly imposed on an

emergency basis for valid and compelling reasons," and 'the trusteeship should be

maintained until such time as the problems that gave rise to the trusteeship have been

fully addressed."  NAGE's Executive Committee affirmed this decision on September 7,

2004.

By the instant Motion, Plaintiffs are seeking leave to amend their complaint in a

variety of ways.  First, the Proposed Amended Complaint seeks to add allegations arising

out of the trusteeship hearing and decision (Count 2).  While there is no merit to these

allegations, Defendants have no objection to this aspect of the proposed amendment.

Second, the Proposed Amended Complaint would add allegations regarding disciplinary

proceedings that are currently underway against Plaintiffs Johnson and Bernsen (Counts

5 and 5[sic][2]), individual discrimination and retaliation claims that Plaintiff Johnson and

Bernsen allege against NAGE and President Holway (Counts 3 and 4), and defamation

and intentional infliction of emotional distress claims that Plaintiffs Johnson and Bernsen

allege against NAGE, President Holway, Trustee Stephanie Zaiser, and Hearing

Examiner Gerald Flynn (Counts 6 and 7).  Finally, Plaintiffs seek to add Stephanie Zaiser

---

[1] On June 14, 2004, Plaintiffs again filed a motion for a temporary restraining order, seeking to
enjoin the trustee from acting to resolve a pending arbitration proceeding.  This Court denied
Plaintiffs' motion, ruling that Plaintiffs had not met their burden to show clear and convincing
evidence that the trusteeship was being maintained in bad faith or for an improper purpose.
[2] Plaintiffs have misnumbered the counts of their Proposed Amended Complaint as there are two
separate counts labeled 'Count 5." ( See Amend. Compl. at 32, 33.)

2

and Gerald Flynn in both their individual and official capacities as additional defendants. While Defendants recognize that under Federal Rule of Civil Procedure 15(a) leave to amend a complaint "shall be freely given when justice so requires," there are limits to that very liberal standard, and much of Plaintiffs' Proposed Amended Complaint exceeds those limits. More specifically, as we set out below, Plaintiffs should not be permitted to add the claims arising out of the internal disciplinary hearings against Plaintiffs Johnson and Bernsen (Counts 5 and 5), the claims for intentional infliction of emotional distress (Count 6 and 7), and Stephanie Zaiser and Gerald Flynn as defendants.

<u>**Argument**</u>

Under Federal Rule of Civil Procedure 15(a), in the current posture of this case, Plaintiffs may only amend their complaint upon leave of the court or by written consent and "leave shall be freely given when justice so requires." The D.C. Circuit, however, has explained that "Courts may deny a motion to amend a complaint as futile ... if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). In this case, Plaintiffs' Counts 5 and 5, which allege that the internal union disciplinary hearings against Ms. Johnson and Mr. Bernsen violate the LMRDA, would not survive a motion to dismiss because they are premature. Moreover, Plaintiffs' allegations regarding intentional infliction of emotional distress (Counts 6 and 7) fail to state a claim upon which relief can be granted and would be dismissed if included in their complaint. Finally, because Ms. Zaiser and Mr. Flynn cannot be sued in their individual capacities as a matter of law and because they are not necessary parties in their official capacities, they should not be added as defendants in any event.

3

1.    **Plaintiffs' claims regarding internal union disciplinary hearings against Ms. Johnson and Mr. Bernsen (Counts 5 and 5) are premature.**

Counts 5 and 5 allege nearly identical claims against NAGE on behalf of Plaintiff Johnson and Plaintiff Bernsen respectively. Plaintiffs allege that 'by disciplining and expelling Johnson [and Bernsen], the defendants are violating 29 U.S.C. §§ 411(a)(1), (2), (4) and (5) and 529."[3] (Amend. Compl. ¶¶ 164, 173) Plaintiffs do not, however, allege that they have actually been expelled or otherwise disciplined by NAGE. Indeed, Plaintiffs could not have alleged that they have been disciplined because NAGE has not even completed its internal disciplinary proceedings against Ms. Johnson and Mr. Bernsen. While the actual hearings in the disciplinary proceedings are finished, the hearing examiner has not issued his decision, nor have Ms. Johnson and Mr. Bernsen exhausted their administrative remedies under the NAGE Constitution. *See* 29 U.S.C. § 411(a)(4) (providing that 'any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof'); NAGE Constitution Art. XII, §§ 6, 4 (attached to Plfs' Mot. for TRO, filed Dec. 9, 2003, Ex. 3 at 34, 35) (requiring the exhaustion of administrative remedies before filing suit).

---

[3] While it is not pertinent to resolving this motion, it is worth noting that Plaintiffs allege that any discipline will be 'due to [their] exercise of [their] rights as a member to free speech and assembly and ... to [their] participation in administrative proceedings and in this litigation" (¶¶ 163, 172). In reality, the disciplinary proceedings charge that Ms. Johnson withheld information from the trustee and, after the trusteeship was in place, changed the mailing address of the Local's bank account from the union's office to her personal home address, and that Mr. Bernsen, after the monitor was in place, refused to provide information to the monitor and improperly closed the Local R3-77 Civil Rights Defense Fund bank account and had the remaining balance transferred into his personal account.

Plaintiffs' failure to complete and exhaust the internal union procedures is fatal to

their claims regarding the union's internal disciplinary hearings (Counts 5 and 5). *See*

*Caivano v. Laborers' Intern. Union of North America*, CIV. A. No. 95-268, 1995 WL

395908, at *2 (D.D.C. May 3, 1995) ('This circuit has long recognized that a union 'has

the right to compel its members to follow certain prescribed practices, among which can

be the requirement to exhaust available internal complaint processes before litigating

against the union.' *Chambers v. Local Union No. 639*, 578 F.2d. 375, 385 n.12 (D.C. Cir.

1978).'); *see also Simmons v. Avisco, Local 713, Textile Workers Union*, 350 F.2d 1012,

1016 (4th Cir. 1965) ('The proviso was designed to further LMRDA's purpose of

achieving union democracy by giving unions a reasonable opportunity to correct abuses

and by encouraging them to set up machinery for the prompt and fair disputation and

review of disputes.').

Because Plaintiffs have not yet been disciplined, much less exhausted their

internal union remedies, Counts 5 and 5 are simply not ripe for adjudication. "A claim is

not ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300

(1998) (citations omitted). Here, Plaintiffs' Counts 5 and 5 are not ripe because until the

hearing examiner for these internal disciplinary proceedings issues a decision, and Ms.

Johnson and Mr. Bernsen exhaust their internal union remedies, it is impossible to know

whether Ms. Johnson and Mr. Bernsen will be finally expelled or otherwise disciplined at

all. *Cf. Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285, 1290, 1295 (3d Cir. 1993)

(where case was not ripe because plaintiff had not yet appealed the decision to the zoning

board, the court of appeals vacated the district court's grant of summary judgment to

5

defendants and remanded with instructions for the district court to dismiss the case);

*Thompson v. Jasas Corporation*, 212 F. Supp. 2d 21, 28 (D.D.C. 2002) (dismissing

without prejudice plaintiff's claim filed before 180 days after filing her EEO claim);

*American Towers, Inc. v. Williams*, 146 F. Supp. 2d 27, 32 (D.D.C. 2001) (granting

motion to dismiss where, '[w]ith respect to the proposed zoning regulations, any claim

plaintiff might have with respect to those regulations is not yet ripe, as the regulations

have not yet been and may never be approved by the Zoning Commission"); *Johnson v.*

*Greater Southeast Community Hospital Corp.*, 903 F. Supp. 140 (D.D.C. 1995)

(dismissing antitrust claim as not ripe where the Hospital's Board of Directors had not yet

made a final decision regarding whether to terminate plaintiff's hospital privileges),

*modified on remand*, 1996 WL 377147 (D.D.C. June 24, 1996) (granting motion to alter

the prior judgment and finding claims justiciable after plaintiff's privileges were in fact

revoked).

Given that Plaintiffs have not even alleged that they exhausted their

administrative remedies (indeed, they cannot given that a decision in their disciplinary

cases has yet to be issued), Plaintiffs are not entitled to amend their complaint to add

Counts 5 and 5.

**2.    Plaintiffs' claims for intentional infliction of emotional distress (Counts 6 and 7) fail to state a claim upon which relief can be granted**

Counts 6 and 7 of Plaintiffs' Proposed Amended Complaint allege that

Defendants are liable for the common law tort of intentional infliction of emotional

distress. 'To recover on a claim for intentional infliction of emotional distress, a plaintiff

must demonstrate 'extreme and outrageous conduct which intentionally or recklessly

cause[d] severe emotional distress." *Rogala v. District of Columbia*, 161 F.3d 44, 57-58

(D.C. Cir. 1998).  Plaintiffs' Proposed Amended Complaint, however, falls far short of alleging conduct sufficiently extreme and outrageous in character.

Plaintiffs assert that Defendants made statements that Plaintiffs 'were guilty of malfeasance and misuse of union money" (Amend. Compl. ¶¶ 180, 182) and that Mr. Bernsen took money that properly belonged to the union (Amend. Compl. ¶¶ 189-90). Assuming that these allegations are true and that the alleged statements were false, they do not allege 'conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (internal quotations omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d ('It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.').

While the District of Columbia courts do not appear to have decided a case with precisely similar facts, a review of cases from other courts applying comparable intentional infliction of emotional distress standards to similar facts also demonstrates that Plaintiffs' allegations are inadequate.  For example, in *Warner v. Buck Creek Nursery, Inc.* 149 F. Supp. 2d 246, 265 (W.D. Va. 2001), the court, applying identical Virginia law, found that plaintiff's allegations that defendants made 'false statements that he was fired for theft--statements that Mr. Warner contends were made with the intent to destroy his reputation in the community," would show 'that the defendants engaged in unacceptable conduct" but would 'simply fail to show that the defendants engaged in

7

conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *See also Wright v. Montgomery Ward & Co., Inc.*, 814 F. Supp. 986, 991 (D. Kan. 1993) (applying Kansas law and finding that Department store's actions in falsely accusing cashier of theft, after which charges were filed and cashier was arrested but eventually acquitted, were not so egregious as to incur liability for intentional infliction of emotional distress).

Courts in the District of Columbia evidence the same skepticism about this tort in cases with facts comparable, albeit not identical, to those described above. For example, in *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 682 (D.C. 1997), the plaintiff claimed that his employer had 'targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position." The court held that the described conduct was 'bf the type attributable to 'employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct.'" *Id.*; *see also Hoffman v. Hill & Knowlton Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (discriminating against plaintiff on the basis of age resulting in interference with employee's ability to work, stating false pretextual reasons for dismissing employee knowing that it would be communicated to others, and ultimately dismissing employee does not rise to the required level of extreme and outrageous conduct). Here, Plaintiffs are alleging that Defendants accused them of misusing or improperly taking union moneys. That allegation is not as extreme as manufacturing

8

evidence of a sexual harassment violation, leaking that accusation to co-workers, and demoting plaintiff.

Thus, because Plaintiffs' Proposed Amended Complaint, like those in the cases discussed above, simply does not allege acts sufficiently extreme and outrageous to make out a claim for intentional infliction of emotional distress. Plaintiffs could not survive a motion to dismiss and their motion for leave to amend their complaint to add this claim should be denied.

**3.    The addition of Stephanie Zaiser and Gerald Flynn as defendants is futile**

Plaintiffs also seek leave to amend their complaint to add as defendants Stephanie Zaiser, the National NAGE trustee over Local R3-77, and Gerald Flynn, the trusteeship hearing examiner. Leave to amend a complaint to add defendants will not be granted, however, where doing so would be futile, either because the defendant would be immune or because the proposed amended complaint fails to state a claim against that defendant. *See, e.g., Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (noting that district court denied motion to amend as futile where plaintiff sought to name officer as a defendant in his individual capacity and officer would be immune from liability under doctrine of qualified immunity); *Graves v. United States*, 961 F. Supp. 314, 318 (D.D.C. 1997) (holding that where a proposed amendment to the complaint would add new defendants, but 'plaintiff's allegations against these additional 'defendants' do not constitute a conspiracy as a matter of law," the motion for leave to amend would be denied as futile).

Here, the Proposed Complaint alleges (1) that Mr. Flynn, as hearing examiner, was biased against Plaintiffs (Amend. Compl. ¶ 108), (2) that Ms. Zaiser, in her role as

9

trustee, discriminated against Plaintiff Johnson (Amend. Compl. ¶¶ 129-30), and (3) that

Ms. Zaiser and Mr. Flynn defamed Plaintiffs through various alleged acts that 'were

within the scope of their employment and/or agency with defendant NAGE" (Amend.

Compl. ¶¶ 181, 183, 191) and which resulted in intentional infliction of emotional

distress (Amend. Compl. ¶¶ 184-86, 194-95). As to each of these claims, either because

Ms. Zaiser and Mr. Flynn are immune from individual liability or because Plaintiffs'

Proposed Amended Complaint fails to state a claim against them, Plaintiffs' motion for

leave to add Ms. Zaiser and Mr. Flynn as defendants should be denied as futile.

Plaintiffs' first claim against Mr. Flynn, that he was biased as hearing examiner, is

part of Plaintiffs' allegation that the trusteeship hearing was unfair, and thus that the

trusteeship was maintained in violation of 29 U.S.C. §§ 462, 464. (Count 2; Amend.

Compl. ¶ 108). Claims brought under this subchapter, which deals with trusteeships,

however, may generally be brought only against the labor organization itself, not its

officers. *See* 29 U.S.C. § 464; *see also Cox v. Hutcheson*, 204 F. Supp. 442. 446 (S.D.

Ind. 1962) ('[W]e agree with the defendants that actions arising out of alleged violation

of Title III of the Act (except section 301) 29 U.S.C. § 461 et seq. may be had only

against labor organization as such by reason of the express provisions of section 304.').

Accordingly, Mr. Flynn is not properly a defendant in Count 2.

Plaintiffs' second allegation is that Ms. Zaiser discriminated against Plaintiff

Johnson in violation of Title VII, 42 U.S.C. §2000e et seq. (Amend. Compl. Count 3;

Amend. Compl. ¶¶ 124, 129-30). As this Circuit has recognized, however, only the

employer can be liable for a violation of Title VII. *See Gary v. Long*, 59 F.3d 1391, 1399

(D.C. Cir. 1995) (recognizing that the relief granted under Title VII is against the

employer, not individual actors). Consistent with this rule, all of the specific allegations in Plaintiffs' Proposed Amended Complaint involve actions Ms. Zaiser took in her official capacity as National Trustee of Local R3-77: the Proposed Amended Complaint alleges that Ms. Zaiser decided to hold in abeyance Ms. Johnson's EEO arbitration (Amend. Compl. ¶ 129), accused Ms. Johnson of embezzlement at a meeting of Local R3-77 (Amend. Compl. ¶ 130), and removed Ms. Johnson from Local R3-77 committees (Amend. Compl. ¶ 130). Thus, Ms. Zaiser is immune from liability under Title VII and her presence as a Defendant to this claim is unnecessary.

Plaintiffs' final claims involve allegations that Ms. Zaiser and Mr. Flynn defamed Plaintiffs through various alleged acts. (Amend. Compl. ¶¶ 180, 182, 190.) However, the Plaintiffs explicitly state in their Proposed Amended Complaint that all the acts complained of "were within the scope of their employment and/or agency with defendant NAGE" (¶¶ 181, 183, 191, 192). Because Plaintiffs are seeking to hold only NAGE liable and are attempting to reach Ms. Zaiser and Mr. Flynn only as the agents of NAGE, adding them as Defendants is an unnecessary burden on Ms. Zaiser and Mr. Flynn with no corresponding benefit to Plaintiffs.

11

## Conclusion

For the foregoing reasons, Plaintiffs' Motion for Leave to File an Amended

Complaint should be denied with respect to the claims regarding the disciplinary hearings

for Plaintiffs Johnson and Bernsen (Counts 5 and 5), the claims regarding intentional

infliction of emotional distress (Counts 6 and 7), and the addition of Stephanie Zaiser and

Gerald Flynn in their individual and official capacities.

Respectfully submitted,

/s/_____

Jeffrey R. Freund
jfreund@bredhoff.com
Abigail V. Carter
acarter@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888

12

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 1, 2004, the foregoing Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend the Complaint was filed electronically. Copies of the foregoing were served to the following by the means noted below:

Valda Johnson, *pro se*
3600 Tupelo Court
Woodbreidge, VA 22192
(by First-Class U.S. Mail)

Stuart Bernsen, *pro se*
10719 Kings Riding Way No. 102
Rockville, MD 20852
stuart.e.bersen@att.net
(by e-mail and First-Class U.S. Mail)

Elizabeth Baker, *pro se*
3315 Glenmoor Drive
Chevy Chase, MD 20815
(by First-Class U.S. Mail)

/s/_____
Abigail V. Carter
Bredhoff & Kaiser, PLLC
805 15th Street, N.W., Ste 1000
Washington, DC 20005
(202) 842-2600

13